# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## FOR SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 18-32106** |
| **ERIN ENERGY CORPORATION, et al.,**[1] | § | |
| | § | **(Chapter 7)** |
| **DEBTORS.** | § | |
| | § | **(Jointly Administered)** |
| | § | |
| **RONALD J. SOMMERS, CHAPTER 7 TRUSTEE FOR ERIN PETROLEUM NIGERIA Ltd.,** | § § § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adversary No. 19-03667** |
| **v.** | § | |
| | § | |
| **NIGERIAN AGIP EXPLORATION LIMITED,** | § § | |
| | § | |
| **Defendant.** | § | |

## FIRST AMENDED COMPLAINT

Ronald J. Sommers (the "<u>Trustee</u>") is the chapter 7 trustee for Erin Petroleum

Nigeria Ltd. ("<u>EPNL</u>").  Defendant Nigerian Agip Exploration Limited ("<u>NAE</u>") held an

arbitration award and judgment against parties other than EPNL.  To enforce the award and

judgment, NAE wrongfully attached and forcibly seized 380,000 barrels of EPNL's crude

oil stored aboard the floating production and storage and offloading unit Armada Perdana

("the <u>FPSO</u>") chartered by EPNL.  NAE had neither a judgment against EPNL nor a claim

to EPNL's crude oil.  NAE's actions caused EPNL to suffer millions of dollars in damages

---

[1] The last four digits of Erin Energy Corporation's federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited; Erin Energy Kenya Limited; and Erin Petroleum Nigeria Limited (collectively with Erin Energy Corporation, "<u>the Erin Debtors</u>").  The Erin Debtors' service address was: 1330 Post Oak Blvd., Suite 2250, Houston, TX 77056, but all correspondence regarding the Debtors should be addressed to the chapter 7 trustee Ronald J. Sommers, Nathan Sommers Jacobs, 2800 Post Oaks Blvd, #6100, Houston, Texas 77056.

and, ultimately, to become insolvent.  NAE's actions in securing and enforcing the writ were inconsistent with the positions it took in the London Arbitration that led to the award and judgment.  EPNL is entitled to judgment against NAE for the damages caused by NAE.  Accordingly, the Trustee files this First Amended Complaint against NAE and in support would show the Court as follows:

## PARTIES

1. The Trustee is the duly-appointed trustee for the chapter 7 estates of Erin Energy Corporation ("Erin") and its wholly owned subsidiary Erin Petroleum Nigeria Ltd.  The Trustee may be served through his undersigned counsel.

2. Defendant Nigerian Agip Exploration Limited is incorporated under the laws of the Federal Republic of Nigeria.  Upon information and belief, NAE may be served at 40/42 Aguiyi Ironsi Street, Maitama, Federal Capital Territory, Abuja, Nigeria.  NAE has appeared in this Adversary Proceeding.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because the chapter 7 case to which this proceeding relates is pending in this district.

## FACTUAL BACKGROUND

5. Until NAE's wrongful attachment and seizure of the FPSO forced EPNL to suspend its operations, EPNL operated oil wells in the Oyo Field, which is located in deep water offshore of Nigeria's southern coast.  EPNL acquired its interest in the Oyo Field from Allied Energy Plc ("Allied") and Allied's affiliate, CAMAC International (Nigeria)

Limited ("CINL"), through a series of transactions over a period of time.[2]  Because these transactions form an important part of the facts in this case, they are briefly summarized here.

## A.      EPNL operated offshore oil and gas production facilities off the coast of Nigeria.

6.      The Oyo Field is part of Oil Mining Lease 120, which, along with Oil Mining Lease 121 (together with Oil Mining Lease 120, the "OMLs"), was awarded to Allied by the Minister of Petroleum Resources (the "Minister").[3]  Shortly after Allied acquired these interests, it transferred two and a half percent (2.5%) of its interest to CINL.

7.      Allied and CINL subsequently entered into a Production Sharing Contract with NAE (the "PSC") dated July 22, 2005.  Under the terms of the PSC, Allied assigned a forty-percent (40%) participating interest in the OMLs to NAE, and NAE was appointed as operator for the OMLs.  Production from the OMLs commenced in December of 2009.

8.      In April 2010, EPNL acquired the portion of Allied's and CINL's rights under the PSC that related to the Oyo Field.  In February 2011, EPNL purchased Allied's and CINL's remaining rights under the PSC, resulting in EPNL's holding a sixty-percent (60%) interest in the production rights under the PSC, which included the Oyo Field.

9.      Allied purchased all of NAE's interests in the OMLs and all of its rights under the PSC under a sale and purchase agreement dated December 29, 2011, as amended by an amendment dated June 28, 2012 (the "SPA").  As a result of this transaction, Allied held a one-hundred percent (100%) interest in the OMLs and forty percent (40%) of the

---

[2] Allied and CINL are referred to as the "Judgment Debtors" in this Amended Complaint.

[3] The interests in these oil and gas properties were originally awarded to Allied as an Oil Prospecting License covering Block 210 off the coast of Nigeria.  The Oil Prospecting License was converted to Oil Mining Leases 120 and 121 in 2001.

production rights under the PSC; EPNL owned the remaining sixty percent (60%) of the production rights under the PSC.  Allied also became the operator of the OMLs.

10.     In February 2014, EPNL and Allied closed a transaction under which EPNL acquired all of Allied's economic interests in the PSC and other related assets, contracts, and rights pertaining to the Oyo Field.  EPNL paid consideration in this transaction, and this transfer made EPNL the sole owner of all of the production rights under the PSC.  By virtue of the transfer from Allied, EPNL also became operator of the OMLs.

11.     Following the transaction, EPNL invested significant capital, as well as additional funds obtained through loan instruments, to develop the Oyo Field.  Because the Oyo Field is offshore, EPNL chartered the FPSO to extract, process, and transport crude oil from the OMLs.  Upon obtaining its interest in the assets, EPNL was at all times in control over OML production, FPSO operation, processing and storage, and subsequent sale of crude oil produced from the OMLS.  EPNL also contracted for the sale of the crude oil produced from the Oyo-8 Well and stored on the FPSO.

12.     As Operator, EPNL processed and stored on the FPSO the oil produced from the Oyo Field.  The FPSO has a treatment capacity of 40,000 barrels of liquids per day and is capable of storing up to one million barrels of crude oil.  EPNL continued this production until NAE's actions in 2018 forced it to suspend operations.

13.     At the time of EPNL's bankruptcy, its most significant asset was its operation of, and correlating beneficial interest in, the OMLs and PSC.  As among EPNL, Allied, CINL, and NAE, EPNL:

- owned the rights deeded under the OMLs;
- owned 100% of the production rights under the PSC;
- was operator of the OMLs and the Oyo Field;

- chartered the FPSO and had a right of possession and control over the FPSO;

- had possession of the produced oil stored on the FPSO; and

- owned the right to sell the produced oil stored on the FPSO and receive the revenues from that sale.

**B.** **NAE secured an arbitration award against Allied and CINL.**

14.    After making the first payment due to NAE under the SPA, Allied failed to make any of the remaining installment payments.  Accordingly, in 2013, NAE commenced arbitration proceeding No. 132498 (the "London Arbitration") in the London Court of International Arbitration against Allied and Allied's parent company CAMAC International Limited ("CIL"), who had guaranteed Allied's obligations under the SPA. CINL was later made a party to the London Arbitration.

15.    During the course of the London Arbitration, the evidence presented and statements on the record by NAE's counsel made clear that NAE knew that Allied had transferred all of its interest in the PSC to EPNL and that, as a result, EPNL (rather than Allied, CIL, or CINL) owned the production from the Oyo Field.  In fact, during the London Arbitration, the Judgment Debtors asserted counterclaims that sought recovery of the costs of operating the OMLs and producing from them.  NAE opposed those counterclaims on the basis that EPNL, not the Judgment Debtors, operated the OMLs and had incurred the costs.

16.    In the London Arbitration, NAE's counsel asserted that:

- The Judgment Debtors assigned to EPNL all of their respective rights, liabilities, duties, covenants, undertakings, warranties, and other obligations contained in the PSC in respect of the Oyo Field, which passed to EPNL the counterclaims asserted in the London Arbitration; and

- EPNL had acquired all rights of the Judgment Debtors, including the claims asserted by the Judgment Debtors in the London Arbitration.

5

17.     On February 14, 2017, the LCIA tribunal issued a final award in favor of NAE against Allied, CIL, and CINL in an aggregate amount of approximately $250 million, plus NAE's legal fees, expenses, and other costs (the "Arbitration Award").  The Arbitration Award was based, in part, upon NAE's representations that EPNL owned the claims and liabilities asserted in the counterclaims by Judgment Debtors.

**C.     NAE wrongfully attached and seized the FPSO and crude oil stored thereon.**

18.     After issuance of the Arbitration Award, NAE sought to enforce it in Nigeria.

19.     To collect on the Arbitration Award, NAE sought enforcement in Nigeria against Allied and CINL.  On April 20, 2017, NAE filed an "Ex-Parte Originating Summons" in the High Court Holden at Lagos, Nigeria (the "High Court").  The Ex Parte Originating Summons sought the enforcement of the Arbitration Award against Allied and CINL pursuant to the Nigerian Arbitration and Conciliation Act.  On May 15, 2017, the High Court issued an order (the "Enforcement Order") recognizing the Arbitration Award and granting NAE the right to enforce it.  On May 30, 2017, the Deputy Chief Registrar of the High Court issued a "Certificate of Judgment" with respect to the Arbitration Award.

20.     On January 23, 2018, the High Court issued the following three documents: (i) "Judgment Summons and Order of Commitment" naming Allied, (ii) "Judgment Summons and Order of Commitment" naming CINL, and (iii) a "Writ of Attachment and Sale of Goods" naming the Judgment Debtors (items (i) – (iii) collectively, the "Writ").  The Writ purported to grant NAE the right to pursue the assets of Allied and CINL located "within the Lagos Judicial Division."   EPNL is not Allied or CAMAC, and EPNL was

neither a party to the Arbitration that resulted in the Arbitration Award, nor a party to any of the proceedings leading up to issuance of the Writ.

21.     On January 30, 2018, EPNL was informed that a helicopter attempted to land on its FPSO under the guise of conducting an unannounced facility inspection by high ranking Nigerian Navy officials.  FPSO personnel obstructed the helipad and did not grant permission to land because neither EPNL nor Bumi Armada ("Bumi"), the entity from which EPNL chartered the FPSO, were aware of an inspection, and it was especially dangerous in that offshore area to permit strangers to board facilities that stored such valuable assets.

22.     The next day, an armed security boat approached the FPSO and announced that she was "under the instruction of the Naval Central command to come to Oyo field," and shortly thereafter a call was received that the central Navy command would visit the FPSO and that it must be given clearance for the visit.  Subsequently, when a helicopter approached the FPSO indicating that it was again carrying high ranking Navy Authorities and intended to land, EPNL consented to the landing.  The four Navy personnel who boarded the FPSO from the helicopter were accompanied by five additional, unannounced persons claiming to be NAE's legal counsel and representatives of the Federal High Court (the "Civilians").  One of them was brandishing firearms.  These Civilians stated that rather than the inspection of the facility upon which their clearance was premised, they were serving legal documents on Allied relating to execution of a judgment authorized by the Federal High Court in Lagos.  While EPNL's onboard representative contacted EPNL management, the Civilians chained, locked, and tagged out the main crude oil export valve and began photographing restricted areas, ignoring the objections of FPSO personnel and

7

refusing to heed the Facility Safety Procedures that required personal protective equipment, preliminary safety gas tests, and limited photography onboard.

23.     The FPSO held EPNL's (not the Judgment Debtors') production and offtake from operations in the Oyo Field.

24.     While NAE was busy seizing EPNL's crude oil, NAE's counsel sent demand letters to Bumi claiming that "the OMLs 120 and 121, the entire crude oil or petroleum produced and to be produced and stored in the FPSO and associated facilities . . . have been seized/attached by the [Writ]."   In their correspondence, NAE's counsel threatened Bumi with civil and criminal prosecution if they interfered with NAE's enforcement of the Writ.

**D.     The Judgment Debtors and EPNL took legal action to invalidate the attachment in Nigeria.**

25.     The Judgment Debtors filed an "Application for Mandatory Injunction" with the High Court of Lagos State, in the Lagos Judicial Division (the "Lagos Court") on February 12, 2018.  On February 20, 2018, NAE filed a "Preliminary Objection," seeking an order to strike the filing by the Judgment Debtors.  NAE also sought enforcement of the Writ.

26.     On March 2, 2018, EPNL filed a "Motion of Notice" with the Lagos Court seeking an order setting aside the Writ and the purported execution carried out by NAE on January 31, 2018, on the grounds that (i) EPNL owned the crude oil on the FPSO, (ii) the Writ did not authorize NAE to attach EPNL's crude oil, and (iii) the attachment of EPNL's crude oil interfered with its constitutionally protected property rights.

27.     On March 8, 2018 the Lagos Court ruled that NAE's conduct in attempting to enforce the Writ was an "abuse of process."

28.     On March 14, 2018, the Judgment Debtors filed a "Notice of Preliminary Objection" with the Lagos Court in which, among other things, the Judgment Debtors stated that they did "not have title in the property or assets attached via the [Writ]"— meaning the FPSO and the crude oil contained on it on January 31, 2018.

29.     On March 16, 2018, the Department of Petroleum Resources ("DPR"), a division of the Ministry of Petroleum Resources of the Nigerian Government and the primary oil and gas regulator in Nigeria, sent a letter to NAE stating that NAE must "unlock the export valve at the Oyo Field Terminal [on the FPSO] the operation (lock/unlock) of which is statutorily vested in [DPR]."

**E.     NAE's wrongful attachment and seizure forced EPNL to shut-in the Oyo-8 well and, ultimately, into bankruptcy.**

30.     During the time of the seizure, the Oyo-8 well was the only producing well operated by EPNL in the Oyo Field.  At that time, approximately 380,000 barrels of crude oil produced from that well were stored on the FPSO.  EPNL had scheduled an offtake of crude oil from the FPSO for March 27-28, 2018.  Based upon the amount of produced oil on board the FPSO and its storage capacity, NAE knew or should have reasonably known that an offtake was scheduled to occur soon.  Due to NAE's wrongful seizure of the FPSO, it was physically impossible to complete the offtake as originally scheduled.  In addition, as a direct consequence of NAE's actions, EPNL was unable to obtain governmental permits necessary to offload the crude oil after the FPSO was eventually unlocked. Without the ability to offload the crude oil stored in the FPSO, EPNL was forced to suspend production from the Oyo Field and to shut-in the Oyo-8 well.

31.     The suspension of the Oyo Field operations and the shut in of the Oyo-8 well put significant financial pressure on EPNL.  With the main export valve of the FPSO

chained and counter-locked, no revenue could be generated and EPNL was unable to meet its obligations. Despite EPNL's efforts to have NAE's wrongful attachment set aside, the costs associated with the shut-in of the Oyo-8 well and the maintenance of the FPSO, in addition to EPNL's obligations to its own creditors, mounted too quickly and forced EPNL into insolvency.

32.     On April 25, 2018, EPNL and its parent and other affiliated debtors (EPNL, together with Erin and the other affiliated debtors, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Southern District of Texas, Houston Division.

33.     On July 13, 2018, this Court signed an Order Authorizing Certain Payments and Order Converting Cases (the "Conversion Order"), which among other things converted the Debtors' chapter 11 cases to cases under chapter 7 effective 9:00 a.m. on July 13, 2018.

34.     On the same date of the Conversion Order, the United States Trustee appointed Ronald J. Sommers as chapter 7 trustee for the each of the Debtors.

35.     NAE filed a proof of claim [Claim No. 25] (the "NAE Claim") against EPNL's bankruptcy estate on October 18, 2018, contesting the Debtors'—including EPNL's—interests in the crude oil that was stored on the FPSO and in the OMLs.

36.     The Trustee filed this action on November 11, 2019.

## CAUSES OF ACTION[4]

### A.    NAE is liable for wrongful attachment.

37.    The Trustee repeats and re-alleges the preceding paragraphs as if fully restated herein in their entirety.

38.    Under both Nigerian and Texas law, a plaintiff may bring suit for wrongful attachment based on a deprivation of possession only.  Nigerian law specifically recognizes that special damages are available when a writ of attachment is executed against property that does not belong to the judgment debtor. As described herein, EPNL had been deeded certain rights relating to the OMLs, owned the production rights under the PSC, operated the OMLs, was the charterer of the FPSO, owned the produced oil stored on the FPSO, and had the right to sell the oil stored onboard the FPSO.

39.    NAE seized control of the FPSO and deprived EPNL of its rights under the OMLs and PSC, its possession and control of the FPSO and the crude oil stored on it, and prevented EPNL from selling the stored oil.

40.    NAE attached and seized control of the FPSO and the crude oil stored in it despite knowing that none of the production rights under the PSC, the FPSO, or the produced oil stored on the FPSO, were property of Judgment Debtors and were, therefore, outside the scope of the Writ.

41.    NAE wrongfully attached property that did not belong to the Judgment Debtors.  Indeed, NAE had represented to the tribunal in the London Arbitration that the production rights under the PSC and responsibility for the costs of operation rested with

---

[4] The Trustee does not take a position as to whether Nigerian or Texas law applies to its causes of action at this time; however, pursuant to Federal Rule of Civil Procedure 44.1, the Trustee gives notice that Nigerian law may be relevant in these proceedings.

EPNL. NAE's wrongful attachment denied EPNL of the right to possession and enjoyment of the seized property that belonged to EPNL.

42.     NAE's wrongful seizure of the FPSO and stored crude oil made it both physically and legally impossible for EPNL to offload the crude oil as it was scheduled to do on March 27-28, 2018. Because NAE's seizure prevented EPNL from offloading the crude oil on the FPSO, EPNL was forced to suspend its operations in the Oyo Field and shut in the Oyo-8 well, resulting in significant damages to EPNL. Ultimately, due to NAE's wrongful seizure and EPNL's forced suspension of activities in the Oyo Field, EPNL was unable to meet its obligations and was forced into bankruptcy.

43.     Without revenues from selling the oil and future production, royalties were not paid to DPR on a timely basis, and the DPR ultimately terminated the OMLs because of that non-payment.

44.     NAE's wrongful attachment caused EPNL to suffer damages equal to the value of (a) what it would have realized from the sale of the crude oil stored on the FPSO, (b) EPNL's interest in the oil that would have been produced but for the shut in of the Oyo-8 well, (c) loss of value of the future production from the OMLs, and (d) the other losses EPNL suffered as a consequence of shutting in the Oyo-8 well, including the loss of its production rights in OMLs 120 and 121 under the PSC. The Trustee is also entitled to recover punitive damages.

45.     NAE is also liable for statutory damages under Section 41 of the Sheriffs and Civil Process Act. That statute provides for special damages resulting from execution of the warrant at the FPSO. Section 41 creates liability for those responsible for execution of a warrant in which an irregularity or informality in the proceedings that led to the

execution of process, the form of process, or the mode of execution damaged the plaintiff. Liability arises from the fact that NAE executed the writ upon property that belonged to EPNL, not the Judgment Debtors, and made misrepresentations to gain access to the FPSO and execute the Writ.

      **B.**     **NAE is liable for conversion.**

     46.     The Trustee repeats and re-alleges the preceding paragraphs as if fully restated herein in their entirety.

     47.     Texas law recognizes a claim for conversion as to personal property, while Nigerian law recognizes claims for conversion as to both real and personal property. Moreover, conversion may be predicated on interference with ownership or the right of possession.

     48.     As alleged herein, EPNL owned both real and personal property converted by NAE. EPNL is the assignee of certain interests in the OMLs and owns 100% of the production rights under the PSC. It was also the operator of the Oyo Field and chartered the FPSO. It owned the produced crude oil stored on the FPSO and the future production from the Oyo Field. It owned the right to sell the crude oil stored on the FPSO. As among EPNL, NAE, and the Judgment Debtors, EPNL owned all of the rights described in this Complaint at the time of NAE's wrongful actions, and the Minister had taken no action to void any of EPNL's rights related to the OMLs.

     49.     On January 31, 2018, NAE utilized armed personnel to seize control of the FPSO and chain and counter-lock its main export valve, thereby depriving EPNL of its use and possession of the FPSO and the crude oil stored there. Those actions directly caused the shut-in of the Oyo-8 well.

50.     NAE's wrongful attachment and seizure of the FPSO and crude oil prevented EPNL from offloading and selling the crude oil stored at the FPSO as well as any oil that would have been produced and sold but for the shut-in of the Oyo-8 well.  Those actions caused EPNL significant damages equal to the value of (a) what it would have realized from the sale of the crude oil stored on the FPSO, (b) EPNL's interest in the oil that would have been produced but for the shut in of the Oyo-8 well, and (c) the other losses EPNL suffered as a consequence of shutting in the Oyo-8 well, including the lost value of its production rights in the OMLs under the PSC.  The Trustee is also entitled to punitive damages.

51.     EPNL quickly filed a notice of claim to the assets with the Nigerian authority that had issued the Writ.  Despite the Court granting relief, EPNL's attempt to prevent irreparable damage was unsuccessful, and consequently EPNL had no choice but to file for bankruptcy in this Court on April 25, 2018.

52.     NAE's actions in boarding the FPSO and counter-locking the valve exhibited a clear repudiation of EPNL's rights in the FPSO, stored oil, future production, PSC, and OMLs.  That clear repudiation of EPNL's rights excuses any failure by EPNL or the Trustee to demand the return of the property.

53.     Nonetheless, the Trustee asserted EPNL's ownership of the produced oil in this Court through his emergency motion to sell the oil stored on the FPSO.  The emergency motion asked this Court to determine whether "EPNL [is] the owner of the Crude Oil." NAE actively participated in the bankruptcy proceeding and even objected to the Trustee's emergency motion. The Trustee's motion to sell the oil constituted a demand for return.

54.     EPNL also contested seizure of the FPSO and the counter-locking of the valves through judicial proceedings.  These acts constituted a demand for return of the converted property.

**C.     NAE is liable for tortious interference with EPNL's existing contracts.**

55.     The Trustee repeats and re-alleges the preceding paragraphs as if fully restated herein in their entirety.

56.     EPNL had a valid contract with Glencore for the offtake of oil produced from the Oyo Field.  EPNL was also the assignee of rights in the OMLs and was, therefore, the beneficial owner of the rights granted in those OMLs.  EPNL owned the production rights under the PSC and operated the Oyo-8 well.  It had chartered the FPSO.  EPNL had scheduled an offtake for March 27-28, 2018.

57.     Before EPNL took assignment of its interest in the OMLs and related rights, NAE owned a 40% participating interest in the production rights under the PSC.  With that prior ownership, NAE was fully aware of the PSC.  As a prior operator under the PSC, NAE knew that the FPSO had limited storage capacity, so oil had to be periodically taken off the FPSO and sold to allow for future production.  The existence of the FPSO charter and the offtake contract with Glencore had been disclosed by EPNL's parent company in public filings.  NAE had presented evidence in the London Arbitration defending against costs claimed by the Judgment Debtors by way of counterclaim, and NAE asserted that those costs were a liability of EPNL, not the Judgment Debtors.  EPNL's parent company's public filings disclosed that it received all of its revenue from EPNL, and EPNL's only business was the operation of the OMLs and the FPSO.

58.     NAE had actual knowledge of the relationships with which it interfered.  At minimum, from its prior ownership, experience in offshore oil production, its knowledge gained in the London Arbitration, the public filings, and other facts detailed herein, NAE had knowledge of facts that would lead a reasonable person to believe that there was a contract or contracts in which EPNL had an interest involving the OMLs, the PSC, the FPSO charter, and the offtake contract to sell oil.

59.     Despite knowing of the assignment to EPNL of its interest in the related contracts, on January 31, 2018, NAE lied to gain access to the FPSO.  Once on board, it utilized armed personnel to seize control of the FPSO and chain and counter-lock its main export valve, thereby depriving EPNL of its use and possession of the FPSO and the crude oil stored there.

60.     NAE attached and seized control of the FPSO and crude oil despite knowledge that neither the FPSO nor the crude oil stored there were property of the Judgment Debtors and with knowledge of the contacts to which EPNL was a party related to the OMLs and the FPSO.  NAE knew that the OMLs, the FPSO, and the stored crude oil were outside the scope of the Writ.

61.     NAE's actions were intentional.  Indeed, the only purpose in locking the valves on the FPSO was to prevent EPNL from selling the produced oil stored on the FPSO, and NAE intended exactly that result.

62.     NAE's wrongful attachment and seizure of the FPSO and crude oil proximately caused injury to EPNL by preventing EPNL from offloading and selling the crude oil stored at the FPSO, as well as any oil that would have been produced and sold in the future but for the shut-in of the Oyo-8 well.

16

63.     EPNL suffered damages equal to the value of (a) what it would have realized from the sale of the crude oil stored on the FPSO, (b) EPNL's interest in the oil that would have been produced but for the shut in of the Oyo-8 well, (c) the other losses EPNL suffered as a consequence of shutting in the Oyo-8 well, including the lost value of its production rights in the OMLs under the PSC, and (d) punitive damages.

**D.      NAE is liable for trespass.**

64.     The Trustee repeats and re-alleges the preceding paragraphs as if fully restated herein in their entirety.

65.     Under Nigerian Law, a claim for trespass can relate to real or personal property.

66.     EPNL chartered the FPSO from Bumi and had possession of the FPSO until it was wrongfully seized.  As operator of the Oyo Field and Oyo-8 Well, assignee of the OMLs and beneficial owner of the rights granted thereunder, and holder of the production rights under the PSC, EPNL had the right to exclude NAE from entry onto the FPSO.  EPNL chartered the FPSO and owned the oil stored there.  NAE lacks standing to contest EPNL's ownership.

67.     NAE's entry onto the FPSO was voluntary and unauthorized.  On January 31, 2018, NAE lied to gain entry to the FPSO, telling EPNL and Bumi that it was there for inspections rather than stating its true purpose.  NAE then physically and intentionally entered the FPSO, utilizing armed personnel, accompanied by NAE's lawyers, to forcibly seize control of the FPSO and chain and counter-lock its main export valve, thereby depriving EPNL of use and possession of the FPSO and the crude oil stored there.  NAE took these actions despite knowing that the writ it sought to enforce did not name EPNL.  NAE

17

knew that Judgment Debtors did not own the production rights under the FPSO, nor were they the charterer of the FPSO.

68.     NAE's attorneys also trespassed onto the FPSO.  For those attorneys to gain access to the FPSO, they made misrepresentations to the personnel on board the FPSO, stating that that they were there for inspections rather than disclosing their actual purpose of denying EPNL access to its stored oil.  To accomplish the trespass, NAE lied to personnel on the FPSO.

69.     NAE's improper seizure of the FPSO deprived EPNL of its right of possession and caused EPNL to incur damages equal to the value of (a) what it would have realized from the sale of the crude oil stored on the FPSO, (b) EPNL's interest in the oil that would have been produced but for the shut in of the Oyo-8 well, (c) the other losses EPNL suffered as a consequence of shutting in the Oyo-8 well, including the lost value of its production rights in the OMLs under the PSC, and (d) punitive damages.  Additionally, NAE's improper seizure caused EPNL to incur millions of dollars of costs to maintain the FPSO for the period that it was deprived of possession.

## OBJECTION TO THE CLAIM

70.     The Trustee repeats and re-alleges the preceding paragraphs as if fully restated herein in their entirety.

71.     Section 502 provides that a filed claim is deemed allowed unless a party in interest objects. *See* 11 U.S.C. § 502.

72.     While a properly executed and filed proof of claim constitutes prima facie evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code, a proof of claim loses the presumption of prima facie validity under Bankruptcy Rule

3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency. See *In re Fidelity Holding Co., Ltd*., 837 F.2d 696, 698 (5th Cir. 1988).

73.     NAE has filed an unsecured claim in an unliquidated amount based on EPNL's assertion of the rights it received from Allied with respect to the OMLs, the PSC, and the production from the OMLs.  These are essentially the same facts that give rise to the claims asserted by the Trustee in this adversary proceeding. The Trustee disputes that there are any amounts due and owing to NAE from EPNL's estate.

74.     As the "the ultimate burden of proof always lies with the claimant," NAE must do more than rely on vague and conclusory statements to support an unknown amount.  *Id*.  NAE therefore has failed to set forth sufficient facts and/or legal theory to support a prima facie claim.

75.     Accordingly, the NAE Claim should be disallowed in its entirety and expunged.  Pursuant to the local rules, a declaration in support of this objection is attached as **<u>Exhibit 1</u>**.

76.     The Trustee hereby reserve his rights to object in the future to NAE's claim on any grounds, and to amend, modify, and/or supplement this Objection at any time, including in the event the Objection is not granted.  This Objection does not constitute any admission or finding with respect to the validity or value of the NAE Claim.

77.     Notwithstanding anything contained in this Objection or attached exhibits, nothing herein shall be construed as a waiver of any rights that the Trustee or other parties in interest have to (a) bring avoidance actions under the applicable sections of the

Bankruptcy Code against holders of claims subject to this Objection or (b) exercise their right to set off against holders of such claims related to such avoidance actions.

78.     The Trustee has not filed a prior objection to the NAE Claim in this Court. However, through the other causes of action set forth herein, the Trustee has disputed the bases on which the NAE relies for its claim.

## PRAYER

**WHEREFORE,** the Trustee respectfully prays for the entry of a judgment (i) awarding damages in the amount of the judgment, including punitive damages, (ii) awarding both pre and post-judgment interest, (iii) awarding the Trustee's attorney's fees determined under the Federal Rules of Civil Procedure, and (iv) disallowing the NAE Claim in its entirety, and granting the Trustee all other relief, at legal or in equity to which he may be justly entitled.

Dated:  March 17, 2021
            Houston, Texas

Respectfully submitted,


/s/ *Elizabeth M. Guffy*
David E. Harrell, Jr.
TBN 00793905
Elizabeth M. Guffy
TBN 08592525
LOCKE LORD LLP
600 Travis, Suite 2800
Houston, Texas  77002
Telephone:  713-226-1200
Facsimile:  713-223-3717
E-mail:  dharrell@lockelord.com
            eguffy@lockelord.com

20

**ATTORNEYS FOR RONALD J. SOMMERS, CHAPTER 7 TRUSTEE FOR ERIN PETROLEUM NIGERIA Ltd.**

## Certificate of Service

I hereby certify that on March 17, 2021, a true and correct copy of the foregoing pleading was served electronically through the Court's ECF system on all parties registered for such service.

/s/ *Elizabeth M. Guffy*
Elizabeth M. Guffy

# **EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**FOR SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 18-32106 |
| **ERIN ENERGY CORPORATION, et al.,**[1] | § | |
| | § | (Chapter 7) |
| DEBTORS. | § | |
| | § | (Jointly Administered) |
| | § | |

| | | |
|---|---|---|
| **RONALD J. SOMMERS, CHAPTER 7** | § | |
| **TRUSTEE FOR ERIN PETROLEUM** | § | |
| **NIGERIA LIMITED,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adversary No. 19-03667 |
| v. | § | |
| | § | |
| **NIGERIAN AGIP EXPLORATION** | § | |
| **LIMITED,** | § | |
| | § | |
| Defendant. | § | |

**DECLARATION OF RONALD J. SOMMERS IN SUPPORT OF THE OBJECTION TO
CLAIM NUMBER 25 FILED BY NIGERIAN AGIP EXPLORATION LIMITED**

I, Ronald J. Sommers, hereby declare as follows:

1.      I am the chapter 7 trustee appointed for the estate of Erin Nigerian Petroleum

Limited ("EPNL").  I make this declaration in support of the objection to Claim Number 25 filed

by Nigerian Agip Exploration Limited ("NAE"), which is set forth in the First Amended Complaint

filed in this adversary proceeding (the "Objection").[2]

---

[1] The last four digits of Erin Energy Corporation's federal tax identification number are 9798. The other Debtors in
these cases are: Erin Energy Limited; Erin Energy Kenya Limited; and Erin Petroleum Nigeria Limited (collectively
with Erin Energy Corporation, "the Erin Debtors").  The Erin Debtors' service address was: 1330 Post Oak Blvd.,
Suite 2250, Houston, TX 77056, but all correspondence regarding the Debtors should be addressed to the chapter 7
trustee Ronald J. Sommers, Nathan Sommers Jacobs, 2800 Post Oaks Blvd, #6100, Houston, Texas 77056.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Amended
Complaint.

1

2.      On or about March 17, 2021, I authorized the filing of an objection to Claim Number 25 filed by NAE (the "Claim").

3.      I read the objection prior to its filing.  To the best of my knowledge, the factual statements contained therein are true and correct.

4.      The Claim asserts an unsecured claim, subject to setoff or recoupment, in an unspecified amount for alleged damages suffered by NAE as a consequence of EPNL's assertion of its right with regard to the OMLs and the PSC.  Based on my review and analysis, the Claim is unsupported by the facts and applicable law.

5.      Moreover, as set forth in the Amended Complaint, EPNL's estate has a number of claims against NAE arising out of EPNL's rights in the OMLs and the PSC.  I believe these are valid claims, the amount of which would exceed any damages allegedly suffered by NAE.

6.      Accordingly, I request that Claim Number 25 be disallowed in its entirety.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this _17_ day of _March_____, 2021.

Ronald J. Sommers, solely in his capacity as Chapter 7 Trustee and not in his individual capacity

2