United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 26, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 18-32106** |
| **ERIN ENERGY CORPORATION,** *et al.*, | § | |
| | § | **CHAPTER 7** |
| Debtors. | § | |
| | § | |
| **RONALD J. SOMMERS,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 19-3667** |
| | § | |
| **NIGERIAN AGIP EXPLORATION** | § | |
| **LIMITED,** | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Ronald Sommers, the Trustee of Erin Energy Corporation's Chapter 7 Estate, seeks tort damages after a Nigerian Sheriff seized crude oil purportedly owned by an Erin Energy subsidiary—Erin Petroleum Nigeria Limited. This seizure occurred off the coast of Nigeria, in Nigerian-controlled waters. A Nigerian company, Nigerian Agip Exploration Limited, instigated the seizure after obtaining a Writ of Attachment from a Nigerian court. Nigerian Exploration responded to the Trustee's attempt to bring this dispute to Texas with a volley of jurisdictional objections. Fundamentally, Nigerian Exploration maintains that this Court lacks jurisdiction over Nigerian Exploration's corporate person. The Trustee contends that Nigerian Exploration consented to (or waived its objection to) the Court's exercise of personal jurisdiction by filing a proof of claim in Erin Energy's main bankruptcy case. Aside from the personal jurisdiction dispute, Nigerian Exploration also challenges the Court's subject matter jurisdiction and

constitutional authority to resolve this dispute, as well as the Trustee's choice to prosecute this action in a Houston bankruptcy court.

Nigerian Exploration sought relief from this Court by filing a proof of claim. That filing operated as consent to this Court's exercise of personal jurisdiction over Nigerian Exploration. However, the Trustee's claims relate only tenuously to Texas and Erin Petroleum's bankruptcy. Moreover, the Trustee's claims turn on discrete property interests arising under Nigeria's pervasive mineral regulations. This proceeding's distant relation to this Court and Erin Petroleum's bankruptcy case, combined with Nigeria's regulation of mineral interests, warrant abstention and dismissal.

Because the Trustee's claims are not "core" matters, this Court lacks the authority to dismiss the Trustee's claims. This Court recommends that the District Court abstain and dismiss the Trustee's claims without prejudice.

## BACKGROUND

Erin Petroleum Nigeria Ltd. operated mineral leases in the Oyo Field in deep water off the coast of Nigeria. Erin Petroleum acquired its interest in the Oyo Field from Allied Energy Plc (as well as from Allied's subsidiary CAMAC International). Allied acquired this interest in the Oyo Field from Nigerian Agip Exploration Limited. Allied's transfer to Erin Petroleum created uncertainty over the ownership of the interests in the Oyo Field. This uncertainty led to the seizure on which this dispute centers. (*See* ECF No. 35 at 15–16, 19–21).

### *Origin of the Seized Oil*

The seized oil originated from two mineral leases covering the Oyo Field off Nigeria's southern coast. Nigeria's federal government regulates mineral leasing in Nigerian waters. (ECF No. 35 at 13). This comprehensive regulatory scheme requires mineral lessees to acquire a mineral

license from Nigeria's Minister of Petroleum Resources.  (ECF No. 35 at 14).  The parties' underlying dispute over the seized oil's ownership stems from a type of governmental license called an "Oil Mining Lease" (OML), which authorizes its holder to produce and market oil from the lease.  (ECF No. 35 at 14–16).  Nigeria's mineral regulations proscribe any transfer or assignment of OMLs absent "prior consent of the Minister [of Petroleum]."  (ECF No. 35 at 15).

Through Allied's efforts, the Oyo Field became capable of production in the early 2000s. (ECF No. 35 at 15–16).  Allied then acquired OMLs 120 and 121 from the Nigerian Ministry of Petroleum.  (ECF No. 35 at 15–16).  A few years after acquiring OMLs 120 and 121, Allied assigned a portion of its "participating interest" in the OMLs to Nigerian Exploration.  (ECF No. 35 at 16).[1]  According to Nigerian Exploration, the Minster of Petroleum consented to this transaction.  (ECF No. 35 at 16).

By 2011, Allied had "purported[ly] convey[ed]" a 60% "interest in the production rights"[2] under the OMLs to Erin Petroleum.  (ECF No. 60 at 4; *see also* ECF No. 35 at 16).  At that time, Erin Petroleum was an Allied affiliate.  (ECF No. 35 at 16).  Neither party alleges that the Minister blessed this transaction.  (*See* ECF No. 35 at 16).

Later in 2011, Allied bought back all Nigerian Exploration's interest in the OMLs.  (ECF Nos. 60 at 4–5; 35 at 16).[3]  Nigerian Exploration concedes that the Minister consented to this transaction.  (ECF No. 35 at 16).  This transaction between Allied and Nigerian Exploration precipitated the seizure underlying the Trustee's suit.

---

[1] Under this assignment (referred to by the parties as the "Production Sharing Contract"), Nigerian Exploration acquired a 40% "participating interest" in the OMLs and became OMLs' operator.  (ECF No. 35 at 16).

[2] Between the two transactions, Erin Petroleum acquired Allied's 60% interest in OML 120's and 121's "production rights."  (ECF No. 35 at 16).

[3] If all transactions were properly consummated, as the Trustee alleges, Allied would have held a 100% "participating interest" in the OMLs, a 40% interest in the OMLs' "production rights," with Erin Petroleum holding the remaining 60% interest in the "production rights."  (*See* ECF No. 60 at 4–5).

In early 2014, Erin Petroleum purportedly "acquired all of Allied's economic interests in the [Production Sharing Contract] and other related assets, contracts, and rights pertaining to the Oyo Field." (ECF No. 60 at 5; *see also* ECF No. 35 at 17). Nigerian Exploration contends that Allied was legally precluded from consummating this transaction. (ECF No. 35 at 17). And neither party suggests the Petroleum Minister consented to this transaction. Nevertheless, Erin Petroleum began operating in the Oyo Field, resulting in the production of the oil that was ultimately seized. (ECF No. 60 at 5).

### *The Seizure*

After it bought back the interest previously conveyed to Nigerian Exploration, Allied defaulted under the terms of the parties' purchase agreement by failing to timely make installment payments. (ECF No. 35 at 16). Allied's failure led Nigerian Exploration to initiate arbitration proceedings before the London Court of International Arbitration in mid-2013. (ECF No. 35 at 16–17). Nigerian Exploration also obtained a Mareva Injunction[4] from the Federal High Court of Nigeria attempting to prevent Allied from transferring the OMLs out of Nigeria. (ECF No. 35 at 17, 17 n.4).

Eventually, Nigerian Exploration obtained an arbitration award against Allied. (ECF No. 35 at 17–18). Nigerian Exploration attempted to enforce that arbitration award through Nigerian legal process. (ECF No. 35 at 18). That process eventually resulted in Nigerian Exploration securing a "Writ" from the Federal High Court in Lagos. (ECF Nos. 60 at 7; 35 at 17). This Writ allowed Nigerian Exploration to pursue Allied's assets within the Lagos High Court's jurisdiction. (ECF No. 60 at 7; *see also* ECF No. 35 at 18–19). During Nigerian Exploration's prosecution of

---

[4] Mareva Injunctions can prevent foreign defendants from removing assets from the jurisdictional reach of the court in which the action against the defendants is pending. *See* Lars E. Johansson, Comment, *The Mareva Injunction: A Remedy in the Pursuit of the Errant Defendant*, 31 U.C. DAVIS L. REV. 1091, 1094 (1998).

the Writ, Allied filed a motion with the High Court challenging the Writ's issuance.  (ECF No. 35 at 18).  That motion was denied.  (ECF No. 35 at 18).

In early 2018, Nigerian Exploration moved to enforce the Writ.  (ECF No. 35 at 18).  The Sheriff of the Lagos High Court, along with Nigerian naval personnel and "civilians," enforced the Writ.  (ECF No. 35 at 18–19).  The Sheriff's enforcement resulted in the seizure of crude oil stored aboard a floating-production-storage-and-offloading vessel, the Armada Perdana (the "FPSO"), which Erin Petroleum leased.  (ECF No. 60 at 2).  According to Erin Petroleum, the Sheriff and accompanying posse used a helicopter to board the FPSO.  (ECF No. 60 at 8).  The Trustee alleges that a member of the posse "was brandishing firearms."  (ECF No. 60 at 8).  The civilians accompanying the Sheriff "chained, locked, and tagged out the main crude oil export valve," preventing Erin Petroleum from offloading crude stored on the vessel.  (ECF No. 60 at 8–9).  Erin Petroleum alleges that, at the time of the seizure, Nigerian Exploration knew Erin Petroleum claimed ownership of the oil being seized.  (*See* ECF No. 60 at 12).

In the seizure's wake, Allied challenged the seizure's propriety.  (ECF Nos. 60 at 10; 35 at 19).  Allied appealed the denial of its motion to prevent the Writ's issuance.  (ECF No. 35 at 19).  Essentially, Allied sought the release of the seized oil, claiming that it did not own the assets seized.  (*See* ECF No. 60 at 10; *see also* ECF No. 35 at 19–20).  Nigerian Exploration contends that, on appeal, Allied represented it owned the seized oil.  (ECF No. 35 at 19).  Though the parties seem to disagree over the substance of the appellate court's ruling, it is clear the Lagos Court of Appeal ruled against Nigerian Exploration.  (*Compare* ECF No. 60 at 9, *with* ECF No. 35 at 19–20).  Nigerian Exploration then appealed to the Supreme Court of Nigeria; that appeal is still pending.  (ECF No. 35 at 19–20).

Erin Petroleum also mounted a legal challenge to the seizure in the Lagos High Court, seeking to have the Writ set aside and damages resulting from Nigerian Exploration's actions. (ECF Nos. 35 at 20; 60 at 9; *see generally* ECF No. 35-10). In its challenge, Erin Petroleum asserted "that (i) the Writ did not authorize [Nigerian Exploration] to attach '[Erin Petroleum's] crude oil' and (ii) attachment of '[Erin Petroleum's] crude oil' interfered with [Erin Petroleum's] constitutionally protected rights." (ECF No. 35 at 20; *see also* ECF No. 60 at 9).

Before the Lagos High Court resolved Erin Petroleum's claims, Erin Petroleum filed for bankruptcy in this Court. (ECF No. 35 at 20). Notwithstanding its bankruptcy, Erin Petroleum maintained its claims in the Lagos High Court, including its claim for damages resulting from Nigerian Exploration's seizure. (ECF No. 35 at 20–21). That action is still pending in Lagos. (ECF Nos. 35 at 21; 54 at 16:2–8).

### Erin Petroleum's Bankruptcy and Nigerian Exploration's Proof of Claim

Erin Petroleum and three of its affiliates entered chapter 11 in April 2018, a few months after the seizure. (ECF No. 60 at 11).[5] In July 2018, Erin Petroleum's bankruptcy was converted to a case under chapter 7 and Ronald Sommers was appointed the Chapter 7 Trustee. (Case No. 18-32106, ECF No. 297 at 1; Case No. 18-32106, July 13, 2018 Docket Entry).

While Erin Petroleum filed bankruptcy far from Nigeria's coast and Nigerian Exploration's headquarters, Nigerian Exploration involved itself in Erin Petroleum's bankruptcy by filing a proof of claim. (*See* ECF No. 42-1). Nigerian Exploration filed its proof of claim to:

> [P]reserve the ability to assert against EEC and EPNL, as applicable, *in the event that it is determined that either of the Debtors own or hold interests in the Mineral Interests, claims under Nigerian, United States, or other applicable law in unliquidated amounts in respect of damages incurred by* [*Nigerian Exploration*], *and/or for specific performance or other relief in*

---

[5] Erin Petroleum's Complaint here alleges that Nigerian Exploration's wrongful seizure was a significant factor leading to Erin Petroleum's chapter 11 filing. (ECF No. 60 at 10–11). However, the seizure is not mentioned in Erin Petroleum's first-day pleadings. (*See, e.g.*, Case No. 18-32106, ECF No. 5 at 5–9).

respect of the Mineral Interests, to the extent permitted by law in respect of wrongful (including without limitation fraudulent) or attempted transfers of interests in the Mineral Interests.

(ECF No. 42-1 at 5–6 (emphasis added)).  Perhaps wary of being haled before a Texas bankruptcy court because it filed a proof of claim, Nigerian Exploration included a disclaimer in its proof of claim:

> *This Claim shall not be deemed a consent by* [*Nigerian Exploration*] *to the jurisdiction of the Bankruptcy Court or to having any matters relating to any disputed claims or otherwise heard by the Bankruptcy Court; nor shall* [*Nigerian Exploration's*] *submission of this Claim waive any of* [*Nigerian Exploration's*] *rights to* have final orders in non-core or *Stern* matters entered only after de novo review by the United States District Court, . . . *or otherwise challenge the jurisdiction of the Bankruptcy Court. This Claim shall not be deemed a waiver or release of* [*Nigerian Exploration's*] *right to trial by jury* in the Bankruptcy Court or in any other court in any proceeding as to any and all matters so triable . . . , nor shall it be construed as a consent to a jury trial in the Bankruptcy Court or in any other court in any proceeding as to any and all matters so triable herein or therein.

(ECF No. 42-1 at 10 (emphasis added)).

Ultimately, the Trustee abandoned the estate's interest, whatever it may have been, in the seized oil on which Nigerian Exploration's proof of claim focused.  (Case No. 18-32106, ECF No. 471 at 1–2).  The seized oil was then sold.  (ECF Nos. 35 at 19; 42 at 22–23).  The sales proceeds are held in an interest-bearing account supervised by Nigerian authorities.  (Case No. 18-32106, ECF No. 470 at 2–3; Case No. 19-3667, ECF Nos. 35 at 19, 42 at 22–23).  The parties' rights to those proceeds remain undetermined.

Like Nigerian Exploration's attempt to protect its interest before this Court, the Trustee sought to protect Erin Petroleum's interests before the Nigerian court.  The Trustee moved to retain Nigerian counsel to represent Erin Petroleum's estate in its attempt to resolve disputes arising from Nigerian Exploration's seizure.  (Case No. 18-32106, ECF No. 488 at 4).  The Trustee also indicated that Nigerian counsel was necessary to prosecute "causes of action for injuries caused

by certain parties [*sic*] acts in Nigeria."  (Case No. 18-32106, ECF No. 488 at 5).  The Court

granted the Trustee's request to retain Nigerian counsel. (*See generally* Case No. 18-32106, ECF

No. 505).  The Trustee's Nigerian counsel then re-urged Erin Petroleum's seizure-related claims

in the Lagos High Court.  (ECF No. 35 at 20–21).

### *Erin Petroleum's Claims in this Court*

Four days after re-urging Erin Petroleum's claims in Nigeria, the Trustee filed this

adversary proceeding.  (*See* ECF No. 1).  The Trustee originally alleged five causes of action

against Nigerian Exploration:

(1)   *Wrongful Attachment* based on Nigerian Exploration's attachment and seizure of the FPSO and crude oil "despite [Nigerian Exploration's] knowledge that neither the FPSO nor the crude oil stored there was property of Allied," (ECF No. 1 at 9);

(2)   *Abuse of Process* based on Nigerian Exploration's "blatant disregard for the ownership of the crude oil stored on the FPSO," which "show[ed Nigerian Exploration's] true motive in satisfying its judgment debt against assets of innocent third parties," (ECF No. 1 at 10);

(3)   *Conversion* based on Nigerian Exploration's seizure "depriving [Erin Petroleum] of its use and possession of the FPSO and the crude oil stored there," (ECF No. 1 at 10–11);

(4)   *Tortious Interference with Erin Petroleum's Contracts* based on Nigerian Exploration's interference, through its seizure, with Erin Petroleum's ability to satisfy its existing contractual obligations relating to the production of crude oil from the Oyo Field, (ECF No. 1 at 11–12); and

(5)   *Trespass* based on Nigerian Exploration's "voluntary and unauthorized" "physical[] and intentional[] ent[ry onto] the FPSO, utilizing armed personnel to forcibly seize control of the FPSO," (ECF No. 1 at 12–13).

The Trustee acknowledges that these claims arise under Nigerian law.  (ECF No. 42 at 35).

Once served, Nigerian Exploration moved to dismiss the Trustee's claims.  (*See* ECF No.

35 at 13).  Nigerian Exploration contends that the Court lacks personal jurisdiction, subject matter

jurisdiction, and constitutional authority to adjudicate the Trustee's claims.  (ECF No. 35 at 13).

Alternatively, Nigerian Exploration argues that a bankruptcy court in Houston is not an appropriate forum to litigate tort claims arising under Nigerian law based on events that occurred in Nigerian waters.  (ECF No. 35 at 13).  Finally, Nigerian Exploration maintains that the Trustee fails to state a claim on which relief can be granted.  (ECF No. 35 at 13).

Nigerian Exploration's Motion to Dismiss prompted the Trustee to seek leave to amend his complaint.  (*See* ECF No. 43).  The Court granted the Trustee's request.  (ECF No. 59 at 1).  The Amended Complaint closely resembles the Original Complaint.  (*Compare* ECF No. 1 *with* ECF No. 60).  The Trustee did, however, omit his claim for abuse of process.  (*See* ECF No. 60 at 12–19).  The Trustee's Amended Complaint also includes (1) a factual allegation referencing Nigerian Exploration's proof of claim and (2) an objection to the proof of claim Nigerian Exploration filed.  (ECF No. 60 at 11, 19–21).

In addition to the request to amend, the Trustee responded to Nigerian Exploration's Motion to Dismiss.  (*See* ECF No. 42).  Relevant here are the Trustee's responses to Nigerian Exploration's challenges to the Court's personal and subject matter jurisdiction.  (*See* ECF No. 13–28).  These responses turn primarily on Nigerian Exploration's filing of a proof of claim.  Specifically, the Trustee argues that Nigerian Exploration consented to personal jurisdiction by filing a proof of claim.  (*See, e.g.,* ECF No. 42 at 13).  The Trustee also maintains that since Nigerian Exploration filed a proof of claim, the Trustee's counterclaims (*i.e.*, the claims asserted here) are core matters, over which the Court necessarily has subject matter jurisdiction.  (*See e.g.*, ECF No. 42 at 16); *see also* 28 U.S.C. § 157(b)(2)(C) (2020).

After the initial round of briefing, the Court held oral argument on the Motion to Dismiss. That argument focused on Nigerian Exploration's personal jurisdiction challenge.  (*See generally*

ECF No. 54).  After the hearing, the Court directed the parties to identify supplemental authorities supporting their respective positions.  (ECF No. 54 at 34:21–36:1).

## DISCUSSION

This dispute resembles a first-year civil procedure exam, as it centers on the intricacies of personal and subject matter jurisdiction in a case involving foreign events and foreign parties. Nigerian Exploration resists the Court's ability to adjudicate this dispute because it is a dispute between two Nigerian companies over events that occurred in Nigeria already the subject of litigation in Nigerian courts.  The Trustee counters that Nigerian Exploration must suffer the consequences of its choice to file a proof of claim and seek relief from this Court.  Still, even if it did consent to personal jurisdiction, Nigerian Exploration argues the Court should abstain from adjudicating the Trustee's claims.

This Court cannot finally resolve Nigerian Exploration's Motion to Dismiss as this proceeding is "non-core."  Absent the parties' consent, in non-core matters the Court may only submit a report and recommendation to the District Court.  Nigerian Exploration's proof of claim vested the Court with personal jurisdiction over Nigerian Exploration.  However, the Trustee's claims' distant relation to Erin Petroleum's bankruptcy, as well as Nigeria's sovereign interest in this action's outcome warrant abstention.  The Court recommends that the District Court abstain from this proceeding and dismiss the Trustee's claims without prejudice.

## I.    THE COURT'S JURISDICTION OVER THE TRUSTEE'S CLAIMS

Nigerian Exploration attacks the bases asserted for both personal and subject matter jurisdiction.  While "there is no unyielding jurisdictional hierarchy" between personal jurisdiction and subject matter jurisdiction, the latter's Article III implications "impel" courts to address subject matter jurisdiction first.  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578, 587–88

(1999). Still, some flexibility exists in ordering jurisdictional inquiries when faced with a difficult subject-matter-jurisdiction question. 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1063.1 (4th ed. 2021). Here, however, the subject-matter-jurisdiction question "involve[s] no arduous inquiry," and is best disposed of first. *Ruhrgas AG*, 526 U.S. at 587–88.[6]

Nigerian Exploration raises its jurisdictional objections under Rule 12. At the Rule 12 stage,[7] the plaintiff bears the burden of establishing the court's jurisdiction over the defendant's person and the suit's subject matter. *See Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 271 (5th Cir. 2021) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)) ("The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction . . . ."); *Zoch v. Magna Seating (Ger.) GmbH*, 810 F. App'x 285, 287 (5th Cir. 2020) (citing *Patterson v. Aker Sols. Inc.*, 826 F.3d 231, 233 (5th Cir. 2016)) ("The plaintiff has the burden of establishing [personal] jurisdiction."). That burden requires the plaintiff to plausibly allege grounds for the court's jurisdiction. *See Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012) (citing *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009)) ("[A]t the Rule 12(b)(1) stage of the proceedings, the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction."); *Zoch*, 810 F. App'x at 287 (citing *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 539 (5th Cir. 2019)) ("[T]he plaintiff may meet his burden [to establish personal jurisdiction] with prima facie evidence."). The facts alleged in the plaintiff's complaint are accepted as true and factual disputes are resolved in the plaintiff's favor. *Zoch*, 810

---

[6] While the subject-matter-jurisdiction issue can be swiftly resolved, the Court's constitutional authority over this dispute presents a separate (more difficult) question. *See In re EP Energy E&P Co., L.P.*, 19-35647, 2021 WL 5917771, at *6 (Bankr. S.D. Tex. Dec. 14, 2021) ("A bankruptcy court's adjudicatory power comes from two distinct, yet related, congressional authorizations—subject matter jurisdiction and adjudicatory authority.").

[7] Federal Rule of Civil Procedure 12 applies to this adversary proceeding through its incorporation by Federal Rule of Bankruptcy Procedure 7012. FED. R. BANKR. P. 7012(b).

F. App'x at 287 (citing *Patterson*, 826 F.3d at 233); *accord Laufer*, 996 F.3d at 271 (5th Cir. 2021) (citing *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009)).

### A.     Subject Matter Jurisdiction

The Trustee cites 28 U.S.C. §§ 1334 and 157 as bases for the Court's subject matter jurisdiction.  Section 157 deals with authority, not subject matter jurisdiction.  28 U.S.C. § 157.  It does not purport to confer subject matter jurisdiction on this Court or the District Court.   Section 1334, on the other hand, explicitly confers on the District Court "original and exclusive jurisdiction" over cases under title 11.  § 1334(a).  This jurisdictional grant extends to "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  § 1334(b).  If the District Court has subject matter jurisdiction under § 1334(a) or (b), § 157 provides the District Court with a mechanism to refer bankruptcy cases and civil proceedings related to bankruptcy cases (*i.e.,* adversary proceedings) to a bankruptcy judge.  *See* § 157(a) ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.").

The subject matter jurisdiction analysis starts with the District Court.  The District Court has subject matter over a proceeding that "aris[es] under," "aris[es] in," or "relate[s] to" a case under title 11.  *See* § 1334(a), (b).  A proceeding *relates to* a case under title 11 if the proceeding's outcome "could *conceivably* have any effect on the estate."  *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (emphasis in original).  Here, the Trustee's successful prosecution of his claims will affect Erin Petroleum's estate—it will be expanded for the benefit of creditors.  The District Court has, at a minimum,

*related-to* subject matter jurisdiction over the Trustee's claims.[8]  Since subject matter jurisdiction

exists in the District Court, this case was properly referred to the Bankruptcy Court under 28 U.S.C.

§ 157(a).

### B.    Personal Jurisdiction

This proceeding presents a more difficult question when it comes to the Court's ability to

exercise personal jurisdiction over Nigerian Exploration.  Like subject matter jurisdiction, the

personal jurisdiction analysis begins with the District Court.  If the District Court can exercise

personal jurisdiction over a defendant in an adversary proceeding, so too can the Bankruptcy Court

through the District Court's referral (subject to the Constitution's limits).  *See* 28 U.S.C. § 157(a),

(b); *see also Cadle Co. v. Lindsey (In re Walker)*, 51 F.3d 562, 570 (5th Cir. 1995) ("[W]hile § 157

gives bankruptcy courts the power to hear some cases, and the power to decide certain cases, *it

does not give those courts the power to hear cases that the district court could not hear*." (emphasis

added)).

As every first-year civil procedure student learns, *International Shoe Co. v. Washington*,

326 U.S. 310 (1945), begat the modern, contacts-centered personal jurisdiction analysis.  Under

this modern scheme, a court's exercise of personal jurisdiction must conform to the requirements

the Fourteenth Amendment's Due Process Clause imposes on courts.  *Id.* at 323–24.

Due process demands that a defendant's conduct establish "minimum contacts" with the

forum in which the court exercising personal jurisdiction sits.  *World-Wide Volkswagen Corp. v.*

---

[8]  Moreover, the Trustee's claims likely "aris[e] in" a case under title 11, as they are estate "counterclaims" asserted "against persons filing claims against the estate."  *See* 28 U.S.C. § 157(b)(1), (2)(C) ("Bankruptcy judges may hear and determine . . . *all core proceedings arising under title 11, or arising in a case under title 11* . . . (2) Core proceedings include, but are not limited to . . . (C) *counterclaims by the estate against persons filing claims against the estate*." (emphasis added)); *see also EP Energy*, 2021 WL 5917771, at *10 ("Under § 157, 'core proceedings' 'aris[e] under' or 'aris[e] in' cases under title 11.").  Of course, the fact that the Trustee's claims are statutorily core does not ultimately determine whether a bankruptcy judge is constitutionally authorized to adjudicate the claims.  *Stern v. Marshall*, 564 U.S. 462, 482 (2011).

*Woodson*, 444 U.S. 286, 291 (1980).  A defendant's "minimum contacts" with the forum should allow the defendant to "reasonably anticipate being haled into court" in that forum.  *Id.* at 297. This requirement "protects the defendant against the burdens of litigating in a distant or inconvenient forum."  *Id.* at 292.

While "minimum contacts" generally guide a court's exercise of personal jurisdiction, a party's consent also authorizes a court's exercise of personal jurisdiction.  *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–04 (1982) (categorizing personal jurisdiction as an "individual right" that can be intentionally or unintentionally waived). Essentially, a court can exercise personal jurisdiction over a defendant without evaluating the defendant's contacts with the forum.  For instance, a defendant can consent to personal jurisdiction by appearing before the court and failing to contest personal jurisdiction.  *See Broad. Music, Inc. v. M.T.S. Enters., Inc.*, 811 F.2d 278, 281 (5th Cir. 1987) (recognizing a defendant's counsel's appearance as consent to the court's personal jurisdiction over the defendant); *Hazen Research, Inc. v. Omega Minerals, Inc.*, 497 F.2d 151, 153 (5th Cir. 1974) ("Where the defendant has appeared in the original action, the judgment in that cause is res judicata on the issue of personal jurisdiction, whether the defendant actually litigated the question or merely permitted it to pass without objection."); *see also* FED. R. CIV. P. 12(h).  Similarly, a plaintiff consents to a court's exercise of personal jurisdiction by filing a complaint.  *See Adam v. Saenger*, 303 U.S. 59, 67–68 (1938) ("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence.").

The parties' personal jurisdiction dispute centers on whether Nigerian Exploration's proof of claim constitutes consent to the District Court's (and by referral this Court's) exercise of personal jurisdiction.  Some courts have recognized a creditor's proof of claim as consent "to personal jurisdiction *in all possible counterclaims* brought by the estate." *Schwinn Plan Comm. v. TI Reynolds 531 Ltd. (In re Schwinn Bicycle Co.)*, 182 B.R. 526, 531 (Bankr. N.D. Ill. 1995) (citing *Kline v. Ed. Zuebli, AG (In re Am. Exp. Grp. Intern. Servs., Inc.)*, 167 B.R. 311, 314 (Bankr. D.D.C. 1994)) (emphasis added).  Other courts have, however, expressed apprehension in accepting a creditor's proof of claim as consent to personal jurisdiction over unrelated counterclaims asserted against that creditor.  *See ECN Cap. (Aviation) Corp. v. Airbus Helicopters SAS (In re CHC Grp. Ltd.)*, No. 3:17-CV-00075-C, 2017 WL 1380514, at *11 (Bankr. N.D. Tex. Mar. 28, 2017) (declining to find personal jurisdiction based on a creditor's proof of claim when a non-debtor initiated an adversary proceeding based on claims distinct from those evidenced by the proof of claim).

The court in *Schwinn Bicycle* accepted a creditor's proof of claim as broad consent to personal jurisdiction.  182 B.R. at 531.  There, the court exercised personal jurisdiction over a debtor's avoidance action against a creditor that filed a proof of claim.  *Id.* at 528.  The court found the creditor's proof of claim evidenced consent to personal jurisdiction.  *Id.* at 532; *accord Am. Exp. Grp.*, 167 B.R. at 314 (finding that the filing of a proof of claim is consent to the bankruptcy court's exercise of personal jurisdiction).  This conclusion necessarily resulted from the Bankruptcy Code's requirement that claims held by recipients of avoidable transfers be disallowed. *Schwinn Bicycle*, 182 B.R. at 532; 11 U.S.C. § 502(d).  Moreover, by filing a proof of claim, the creditor "sought to avail itself of the benefits of federal bankruptcy law" in the same way a plaintiff filing a complaint "demand[s] justice from the defendant."  *Schwinn Bicycle*, 182 B.R. at 531

(quoting *Adam*, 303 U.S. at 67–68). It would have been "unjust" to deny the debtor an opportunity

to pursue counterclaims against a creditor that sought the benefits of the court's power but hoped

to remain immune to "claims against it as a defendant." *Id.* (citing *Burnham v. Super. Ct. of Cal.,*

*Marin Cnty.*, 495 U.S. 604, 638 (1990) (Brennan, J., concurring)).

The more limited view of proofs of claim as consent to personal jurisdiction stems from

*Stern's* recognition that the Constitution limits bankruptcy courts' adjudicatory authority. *See,*

*e.g., Kriegman v. Cooper (In re LLS Am., LLC)*, No. 09-06194-PCW11, 2012 WL 2564722, at *5–

6 (Bankr. E.D. Wash. July 2, 2012) (quoting *Stern*, 564 U.S. at 503). *Stern* identified a subset of

claims that could arise in a bankruptcy case that a bankruptcy court could statutorily adjudicate,

but which the Constitution did not authorize the bankruptcy court, as a non-Article III court, to

resolve. *Stern*, 564 U.S. at 485–87, 499 (recognizing that bankruptcy courts' lack of Article III

power limits their adjudicatory authority to those disputes concerning "public rights"[9] and claims

that would "necessarily be resolved in the claims allowance process"). Applying *Stern* to a court's

exercise of personal jurisdiction, the *LLS America* court explained:

> *Stern* generally stands for the proposition that the filing of a proof of claim
> in bankruptcy is not a *consent to personal jurisdiction over claims held by*
> *the estate which are unrelated to bankruptcy law or unrelated to the*
> *creditor's claim* against the bankruptcy estate. *Stern* did not abrogate
> existing decisional authority that the filing of a proof of claim in bankruptcy
> is a consent to personal jurisdiction over claims held by the estate which
> arise under bankruptcy law or are related to the creditor's claim against the
> estate.

2012 WL 2564722, at *7 (emphasis added). *LLS America's* reasoning implies a subset of estate

counterclaims exist over which a district court (and by referral a bankruptcy court) could not

---

[9] Despite writing for the majority in *Stern*, Chief Justice Roberts intimated that bankruptcy rights exist apart from "public rights" with respect to Article III's limits. *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 690 (2015) (Roberts, C.J., dissenting) ("Our precedents have[, in addition to 'public rights',] recognized an exception to the requirements of Article III for certain bankruptcy proceedings.").

exercise personal jurisdiction based on a creditor's proof of claim—claims "*unrelated to bankruptcy law or unrelated to the creditor's claim*." *Id.* (emphasis added). Put another way, *LLS America* suggests that the Article III line drawn in *Stern* operates as the dividing line between those counterclaims over which a court may exercise personal jurisdiction based on a proof of claim and those a court may not. *Compare id.*, *with Stern*, 564 U.S. at 485–87, 499.

The court in *CHC Group* built on the limitation recognized in *LLS America*. There, the bankruptcy court declined to exercise personal jurisdiction over a non-debtor's (another creditor) counterclaims against a creditor that were unrelated to the creditor's proof of claim. *CHC Grp.*, 2017 WL 1380514, at *8–12. However, unlike *LLS America*, *CHC Group* does not explicitly rely on *Stern* in reaching the conclusion that a court cannot exercise personal jurisdiction over counterclaims against a creditor that are unrelated to the creditor's proof of claim. Still, *CHC Group* implies (with little justification) that there exists a subset of counterclaims over which a bankruptcy court, through referral, cannot exercise personal jurisdiction based on a creditor's proof of claim. The distinction between related and unrelated counterclaims recognized in *LLS America* and *CHC Group* finds little support in *Stern* or existing personal jurisdiction jurisprudence.

For several reasons, this Court declines to adopt *LLS America* or *CHC Group*. First, *Stern* is not a personal jurisdiction case. Rather, *Stern* addressed whether a bankruptcy court, which lacks the trappings of an Article III court (*i.e.,* life tenure and an undiminishable salary), had the constitutional authority to enter a final judgment on a common law tort claim. 564 U.S. at 469. Specifically, whether bankruptcy courts could, constitutionally, exercise Article III power—"the judicial power of the United States"—while lacking Article III qualifications *Id.* at 487–88. The Court held that bankruptcy courts could not wield such power. *Id.* at 502–03. Instead, bankruptcy courts could only exercise authority akin to the "judicial power of the United States" when

resolving claims against the bankruptcy estate or claims arising under the Bankruptcy Code.  *Id.* at 488–93.  Put simply, *Stern* defined the constitutional extent of bankruptcy courts' judicial power. In contrast, personal jurisdiction cases identify the circumstances under which courts can exert judicial power over specific defendants.  *See, e.g., Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1779 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011)) ("Because 'a state court's assertion of jurisdiction exposes defendants to the State's coercive power,' it is 'subject to review for compatibility with the Fourteenth Amendment's Due Process Clause.'").  Unsurprisingly, *Stern* makes no mention of personal jurisdiction or defendants' due process rights.  *Stern* simply had nothing to do with personal jurisdiction.

Second, the constitutional protections at issue in *Stern* differ from those secured by due process.  *See Ins. Corp. of Ir.*, 456 U.S. at 702 (noting, with respect to Article III's subject-matter-jurisdiction requirement, that "the requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause").  Article III, on which *Stern* rests, "is an inseparable element of the system of checks and balances that both defines the power and protects the independence of the judicial branch."  *Stern*, 564 U.S. at 482–83 (quoting *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982)) (internal quotation marks omitted).  In defining the judicial branch's power, Article III ensures that judges of the United States faithfully exercise the "judicial power of the United States."  *See Stern*, 564 U.S. at 484 ("Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III.").  Article III does so by preventing government's other branches from encroaching on the judiciary's role in our constitutional system, and by

insulating judges from political pressures that may undermine the faithful exercise of the "judicial power." *See id.* at 483–84 ("Article III protects liberty not only through its role in implementing the separation of powers, but also by specifying the defining characteristics of Article III judges. . . . [T]he Framers sought to ensure that each judicial decision would be rendered, not with an eye toward currying favor with Congress or the Executive. . . ."). Put differently, Article III is primarily a restriction on the legislative and executive branches. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986) ("Article III, § 1 safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals . . . , and thereby preventing the encroachment or aggrandizement of one branch at the expense of the other." (quotation cleaned up)). Article III thus protects the liberty of the "People" by imposing the Constitution's structural limits on each branch of the federal government. *See* THE FEDERALIST NO. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny.").

Due process, however, protects *individual* liberty by prohibiting the judiciary (state or federal) from exerting power over defendants who could not reasonably expect to be haled into court. *World-Wide Volkswagen*, 444 U.S. at 291. Specifically, the Due Process Clause restrains the judiciary by insulating nonresidents from defending against suit in distant forums and by precluding courts from reaching beyond their jurisdictional limits. *Id.* at 291–92. Unlike the structural restraints Article III imposes on the branches of government, the Due Process Clause restrains government's (state or federal) power, exercised through its judicial branch, over individuals. *See Ins. Corp. of Ir.*, 456 U.S. at 702 ("The personal jurisdiction requirement

recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.").[10]  Because the constitutional aims of Article III and the Due Process Clause diverge, it would be inappropriate to conflate *Stern's* holding with those of the Supreme Court's personal jurisdiction cases.  *Accord Hongkong & Shanghai Banking Corp. Ltd. v. Brandt for CFG Peru Invs. Pte. Ltd. (Sing.)*, No. 17-CV-6672 (VEC), 2017 WL 6729191, at \*5 (S.D.N.Y. Dec. 29, 2017) ("*Stern* has no bearing on the jurisdictional question before the bankruptcy court here, namely whether filing a proof of claim in a bankruptcy matter provides a basis for personal jurisdiction over a foreign party.").

It is well-settled that a plaintiff consents to personal jurisdiction over all counterclaims brought against it by a defendant.  6 MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1424 (3d ed. 2022) ("[I]f defendant interposes a permissive counterclaim, plaintiff cannot object that the court lacks personal jurisdiction or that venue is improper for purposes of adjudicating the claim."); *see also Adam*, 303 U.S. at 67–68 ("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes . . . ."); *Trade Well Int'l v. United Cent. Bank*, 825 F.3d 854, 859 (7th Cir. 2016) (citing *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932)) ("[W]hen a defendant interposes a permissive counterclaim, the plaintiff

---

[10] Of course, Article III affords litigants a "personal right" to Article III adjudication, which is "subject to waiver." *Wellness Intern.*, 575 U.S. at 678 (quoting *Schor*, 478 U.S. at 848).  However, nothing in the Supreme Court's jurisprudence suggests that a defendant's waiver of personal jurisdiction objections through the defendant's voluntary appearance is tantamount to a waiver of that defendant's right to have an Article III court resolve claims against the defendant.  *Stern* itself forecloses such equivocation.  There was no question that the bankruptcy court in *Stern* had personal jurisdiction over the defendant and that the defendant was voluntarily before the bankruptcy court. *See* 564 U.S. at 481–82.  Still, Article III prohibited the bankruptcy court's resolution of the plaintiff's common law claims.  *Id.* at 482.  Moreover, it would be unjust to surprise a defendant by accepting their voluntary appearance as consent to non-Article III adjudication in addition to a consent to personal jurisdiction.  *See Wellness Intern.*, 575 U.S. at 685 (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)) ("It bears emphasizing, however, that a litigant's consent—whether express or implied—must still be knowing and voluntary. . . . [T]he key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator.").

cannot object that the court lacks personal jurisdiction for purposes of adjudicating the claim."). Of course, personal jurisdiction jurisprudence has changed dramatically since the Supreme Court recognized a plaintiff's complaint as consent to a court's exercise of personal jurisdiction over a defendant's counterclaims.  *Compare Pennoyer v. Neff*, 95 U.S. 714, 733 (1877) ("To give such proceedings any validity, there must be a tribunal competent by its constitution . . . if that involves merely a determination of the personal liability of the defendant, *he must be brought within its jurisdiction by service of process within the State, or his voluntary appearance*." (emphasis added)), *with Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)) ("Following *International Shoe*, '*the relationship among the defendant, the forum, and the litigation*', rather than the mutually exclusive sovereignty of the States on which the rules of *Pennoyer* rest, *became the central concern of the inquiry into personal jurisdiction*.'" (emphasis added)).  Remaining constant, however, is that a party subjects itself to a court's personal jurisdiction through its voluntary appearance.  *Compare Pennoyer*, 95 U.S. at 733 (recognizing that a court may hold a defendant personally liable if the defendant voluntarily appears before the court), *with Ins. Corp. of Ir.*, 456 U.S. at 703 ("[R]egardless of the power of the State to serve process, an individual may submit to the jurisdiction of the court by appearance."). That constant encompasses a plaintiff who submits to a court's exercise of personal jurisdiction by filing a complaint.  And once a plaintiff attempts to avail itself of a particular forum's benefits by filing a complaint, the plaintiff must bear the consequences of that availment—the plaintiff must answer to counterclaims.  *See Trade Well Int'l*, 825 F.3d at 859 ("When a plaintiff files a claim in a particular state, he should reasonably expect to answer a counterclaim in that forum.").

It is similarly well-established that a creditor's proof of claim is effectively a complaint against the debtor.  *See O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, 928 F.2d 127, 129

(5th Cir. 1991) ("[T]he filing of a proof of claim is analogous to the filing of a complaint in a civil action, with the bankrupt's objection the same as the answer.").[11]  Like a complaint, a creditor's proof of claim represents a request for judicial intervention—an adjudication that the creditor is entitled to monetary relief.  *Compare Adam*, 303 U.S. at 67 ("The plaintiff . . . demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes . . . ."), *with Gardner v. New Jersey*, 329 U.S. 565, 573 (1947) ("It is traditional bankruptcy law that he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure.").  Just as a complaint's filing imposes consequences on a plaintiff, courts have generally imposed similar consequences on creditors filing proofs of claim. Specifically, courts have accepted creditors' proofs of claim as consent to personal jurisdiction over debtors' counterclaims.  *See Arecibo Cmty. Health Care, Inc. v. Puerto Rico*, 270 F.3d 17, 26 (1st Cir. 2001) ("Similarly, the filing of a proof of claim waives an individual's due process right to insist on minimum contacts within the forum state before being subject to the court's jurisdiction.").[12]

---

[11] *See also Berry v. Chrysler Credit Corp. (In re Ferris)*, 764 F.2d 1475, 1477–78 (11th Cir. 1985) (same); *Litton Loan Servicing v. Eads (In re Eads)*, 417 B.R. 728, 741 (Bankr. E.D. Tex. 2009) (same); *In re Cagle*, No. 07-11689-WHD, 2008 WL 7874772, at *4 (Bankr. N.D. Ga. June 2, 2008) (same); *Cruisephone, Inc. v. Cruise Ships Catering & Servs. N.V. (In re Cruisephone, Inc.)*, 278 B.R. 325, 330 (Bankr. E.D.N.Y. 2002) (same); *Am. Exp. Grp.*, 167 B.R. at 313 (same); *In re Ira Haupt & Co.*, 253 F. Supp. 97, 98 (S.D.N.Y. 1966) (same).

[12] *See Brandt*, 2017 WL 6729191, at *5 ("[I]t is well-settled that filing a proof of claim subjects a party to a bankruptcy court's personal jurisdiction."); *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 (Bankr. S.D.N.Y. 2021) (citing *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010)) (acknowledging that the filing of a proof of claim is consent to personal jurisdiction); *Lehman Brothers Special Fin., Inc. v. Bank of Am., N.A. (In re Lehman Brothers Holdings Inc.)*, 544 B.R. 16, 34 (Bankr. S.D.N.Y. 2015) (same); *Cruisephone*, 278 B.R. at 331 (same); *In re Synthesis Indus. Holdings 1 LLC*, No. 18-15993-MKN, 2019 WL 5783254, at *4 (Bankr. D. Nev. Aug. 7, 2019) (citing *Keys v. 701 Mariposa Project, LLC (In re 701 Mariposa Project, LLC)*, 514 B.R. 10, 16 (B.A.P. 9th Cir. 2014)) (same); *Am. Exp. Grp.*, 167 B.R. at 314 ("[A] party who files a proof of claim subjects himself to the personal jurisdiction of the bankruptcy court with respect to all possible counterclaims by the estate."); *Schwinn Bicycle*, 182 B.R. at 531 (same); *Aurora Mgmt. Partners, Inc. v. GF Fin. Servs., Inc. (In re Protected Vehicles, Inc.)*, 429 B.R. 856, 861 (Bankr. D.S.C. 2010) (same); *Anheuser-Busch, Inc. v. Pacques, Inc. (In re Paques, Inc.)*, 277 B.R. 615, 625 (Bankr. E.D. Pa. 2000) (same); *accord Luan Invests. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 231 (2d Cir. 2002) (noting that a proof of claim can

*Stern* does not support a departure from the consensus—that the filing of a proof of claim, like a complaint, is consent to personal jurisdiction.  Nigerian Exploration offers little justifying a departure from the entrenched body of jurisprudence defining the effects a complaint's filing has on a court's exercise of personal jurisdiction.  Nor does Nigerian Exploration make a convincing argument for rejecting the consensus position that a proof of claim operates as consent to personal jurisdiction.

Personal jurisdiction protects unwitting defendants from being haled before far-flung, foreign courts.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" (quotation cleaned up)).  When parties voluntarily appear in court seeking affirmative relief, they are no longer unwitting.  *See Adam*, 303 U.S. at 67–68; *see also Ins. Corp. of Ir.*, 456 U.S. at 703 ("[R]egardless of the power of the State to serve process, an individual may submit to the jurisdiction of the court by appearance.").  A proof of claim is a creditor's voluntary request for affirmative relief.  *Am. Exp. Grp.*, 167 B.R. at 313–14 (explaining that a creditor's proof of claim is a request for affirmative relief analogous to a plaintiff's complaint).  Such a request is the definition of acquiescence to a court's exercise of personal jurisdiction.  *See id.* at 314 ("Finding that a party who chooses to file a proof of claim has submitted to personal jurisdiction in the bankruptcy court seems a small price to exact for allowing the claimant to purposefully avail itself of the benefits of the bankruptcy forum and to share in the estate's distribution."); *accord Adam*, 303 U.S. at 67–68 ("[T]here is nothing arbitrary or unreasonable in

---

evidence consent to personal jurisdiction); *In re Bailey & Assocs., Inc.*, 224 B.R. 734, 738 (Bankr. E.D. Mo. 1998) (finding that a proof of claim amounts to sufficient "minimum contacts" with the forum state).

treating [a plaintiff] as being [before the court] for all purposes for which justice to the defendant requires [the plaintiff's] presence.").

Contrary to Nigerian Exploration's suggestion, the Court need not "create personal jurisdiction." (ECF No. 47 at 17). Nigerian Exploration "create[d]" personal jurisdiction when it filed a proof of claim in Erin Petroleum's bankruptcy case. *Schwinn Bicycle*, 182 B.R. at 531. Moreover, Nigerian Exploration freely chose to file that proof of claim to "preserve the ability to assert against EEC and EPNL . . . claims under Nigerian, United States, or other applicable law in unliquidated amounts in respect of damages incurred by Nigerian Exploration." (ECF No. 42-1 at 5–6). In doing so, Nigerian Exploration sought to avail itself of the protections provided by the Bankruptcy Code and by this Court. Now, Nigerian Exploration must accept the consequences of its choice. *Cf. Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 265 (5th Cir. 2001) (explaining that a defendant's choice to avail itself the benefits of federal admiralty law, which limited shipowners' liability for injuries occurring at sea, required the defendant to "fulfill its concomitant responsibility" by acquiescing to a federal court's exercise of personal jurisdiction).

By filing its proof of claim, Nigerian Exploration consented to personal jurisdiction.

## II.   THE COURT'S EXERCISE OF SUBJECT MATTER JURISDICTION OVER THE TRUSTEE'S CLAIMS

Congress imposed a "virtually unflagging obligation" on federal courts to exercise the subject matter jurisdiction Congress conferred on federal courts. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Courts may surrender their jurisdiction only in "exceptional circumstances." *Royal & Sun All. Ins. Co. of Can. v. Century Intern. Arms, Inc.*, 466 F.3d 88, 93 (2d Cir. 2006). Nigerian Exploration urges this Court to decline to exercise its jurisdiction over this case based on "exceptional circumstances." Primarily, Nigerian Exploration argues that this proceeding's foreign focus and the existence of a Nigerian parallel proceeding are

"exceptional circumstances" that warrant dismissal.  The Trustee counters that there is nothing exceptional about this Court adjudicating the Trustee's claims.  Because this dispute is between Nigerian companies and involves events occurring exclusively in Nigeria, it is best resolved by Nigeria's courts.

Nigerian Exploration argues the Court should dismiss the Trustee's claims under 28 U.S.C. § 1334's abstention provisions or under the doctrine of *forum non conveniens*.  While the Trustee bore the burden of establishing this Court's jurisdiction, Nigerian Exploration was required to establish that abstention is appropriate.  *See DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 794 (5th Cir. 2007) ("The defendants bear the burden of proof on all elements of the *forum non conveniens* analysis."); *Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 102 (Bankr. S.D.N.Y. 2010) ("The movant bears the burden of establishing that permissive abstention is warranted."); *Petroleum Prods. & Servs., Inc. v. McClinton Energy Grp., LLC (In re Petroleum Prods. & Servs., Inc.)*, 561 B.R. 662, 665 (Bankr. S.D. Tex. 2016) ("The burden to prove that all of these elements of mandatory abstention are present is on the moving party.").  That burden demands that Nigerian Exploration demonstrate that "the interest of justice would be [better] served by [this] case being heard in a foreign tribunal where the action arose."  *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 833 (5th Cir. 1993).

### A.    Statutory Basis for Abstention

The parties go on for pages about the well-settled factors courts consider when applying 28 U.S.C. § 1334(c).  However, little attention is given to § 1334(c)'s text.  Section 1334 identifies two scenarios in which a court may or must abstain from hearing proceedings related to cases under title 11:

> (1) . . . nothing in this section prevents a district court *in the interest of justice, or in the interest of comity with State courts or respect for State law,*

from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party *in a proceeding based upon a State law claim or State law cause of action*, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, *the district court shall abstain from hearing such proceeding if an action is commenced*, and can be timely adjudicated, *in a State forum of appropriate jurisdiction*.

28 U.S.C. § 1334(c)(1), (2) (emphasis added).  Section 1334(c)(1) permits a court to abstain, while § 1334(c)(2) requires abstention.  Critically, both provisions refer to State law and State forums, not foreign or international law or forums.  Nevertheless, Nigerian Exploration maintains that both provisions apply here and warrant abstention.

Nigerian Exploration argues § 1334(c)(2) demands the Court's abstention because the Trustee's claims are based on Nigerian law and are already the subject of a Nigerian proceeding. Under § 1334(c)(2), courts must abstain from adjudicating proceedings: (1) that have no independent basis for federal jurisdiction aside from 28 U.S.C. § 1334(b); (2) require the adjudication of non-core matters; (3) are the subject of an existing State court proceeding; and (4) can be timely adjudicated by the State court.  *Schuster v. Mims (In re Rupp & Bowman Co.)*, 109 F.3d 237, 239 (5th Cir. 1997).  Nigerian Exploration's reading of § 1334(c)(2) erroneously equates "State forum" with "foreign forum."

Nigerian Exploration disregards § 1334(c)(2)'s plain text.  Congress chose to require the existence of a proceeding in a "State forum of appropriate jurisdiction" before mandating a federal court's abstention.  28 U.S.C. § 1334(c)(2); *See also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Had Congress intended to premise a federal court's mandatory abstention on the existence of a proceeding in a *foreign* forum, it is unlikely Congress would have

modified the phrase "forum of appropriate jurisdiction" with the word "State." *Cf. Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998) (recognizing that Congress's choice to not modify a phrase in a statute forecloses reading the statute as if it included modifiers). Moreover, Congress has taken pains to differentiate between the several states and foreign states when using "state" to refer to both bodies in statutes. *See* 28 U.S.C. § 1332(a)(1), (2) ("(1) *citizens of different States*; (2) citizens of a State *and citizens or subjects of a foreign state* . . . ." (emphasis added)); § 4101(2) ("The term 'foreign court' means a court, administrative body, or other tribunal of a foreign country."); *see also* 11 U.S.C. § 1502(3) ("'[F]oreign court' means a judicial or other authority competent to control or supervise a foreign proceeding."); § 101(23) ("The term 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign country . . . ."). Congress also uses "State," with a capital "S," when referring to the several states and "state," with a lowercase "s," when referring to foreign nations. *See* 28 U.S.C. § 1332(a)(1), (2); 11 U.S.C. 101(27) ("The term 'governmental unit' means United States; *State*; . . . *foreign state*; department, agency, or instrumentality of . . . a *State*, . . . or a *foreign state* . . . ." (emphasis added)"); *accord* 11 U.S.C. § 101(52) ("The term 'State' includes the District of Columbia and Puerto Rico . . . ."). Section 1334(c) provides for mandatory abstention where there is an existing proceeding in a "*State* forum." The capitalization in § 1334(c)(2) indicates Congress meant to predicate mandatory abstention on an existing proceeding in the courts of one of the United States. *Cf. Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571 (2012) ("[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (quotation cleaned up)).

This construction is consistent with "state's" plain meaning, which can include foreign countries, but also refers to the several states of the United States. *See State*, WEBSTER'S CONCISE

DICTIONARY OF THE ENGLISH LANGUAGE (1998 ed.) ("6. A sovereign political community; nation. 7. A political and territorial unit with such a community: the *state* of Maine. . . ."). The latter definition, referencing the several states, is consistent with existing interpretations of the word "State," as used in other sections of the United States Code. *See Duncan v. Walker*, 533 U.S. 167, 172–75 (2001) (holding that "*State* post-conviction . . . review," under 28 U.S.C. § 2242(d), refers to one of the several states' post-conviction review and not to a federal court's post-conviction review).

Had Congress intended § 1334(c)(2) to encompass proceedings in foreign jurisdictions, Congress knew how to express that intent. *Cf. Boureslan v. Aramco, Arabian Am. Oil Co.*, 892 F.2d 1271, 1274 (5th Cir. 1990), *aff'd sub nom. E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) (relying on statutory provisions with different terms to conclude that "when it desires to do so, Congress knows how to give extraterritorial effect to one of its statutes"). Section 1334(c)(2)'s plain terms evidence no such intent.

Reading "State" expansively, as Nigerian Exploration does, severs it from its context in § 1334(c)(2), existing precedent, and Congress's general use of the term. *Accord Tera Res. Co. v. Lee (In re Cuzco Dev. U.S.A., LLC)*, 592 B.R. 352, 362 n.27 (Bankr. D. Hi. 2018) (finding that § 1334(c)(2)'s text foreclosed an application of mandatory abstention based on the existence of a proceeding in a foreign jurisdiction). Nigerian Exploration cannot rely on § 1334(c)(2) as a basis for dismissal of the Trustee's claims.

Nigerian Exploration's request for dismissal does find support in § 1334(c)(1). Section 1334(c)(1) affords courts discretion to abstain from adjudicating proceedings related to cases under title 11 "*in the interest of justice*, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1) (emphasis added). In granting courts broad discretion to abstain

from adjudicating bankruptcy-related claims "in the interest of justice," Congress incorporated existing federal abstention doctrines into § 1334.  *Baumgart*, 981 F.2d at 833 (citing *Coker v. Pan Am. World Airways, Inc. (In re Pan Am. Corp.)*, 950 F.2d 839, 846 (2d Cir. 1991)).  Relevant here, § 1334(c)(1) incorporates the doctrines of international comity and *forum non conveniens*.  *Bozel*, 434 B.R. at 102 (citing *Baumgart*, 981 F.2d at 833); *see also In re CPW Acquisition Corp.*, No. 08-14623 AJG, 2011 WL 830556, at *6–8 (Bankr. S.D.N.Y. Mar. 3, 2011) (relying on the doctrine of international comity to determine whether permissive abstention was appropriate).  Hence, § 1334(c)(1) provides Nigerian Exploration with an avenue to dismissal under existing federal abstention doctrines.

### B.    Justification for Abstention

Nigerian Exploration was required to demonstrate the existence of exceptional circumstances warranting abstention.  The Nigerian origin of the claims in this proceeding, the claims' attenuation to Erin Petroleum's bankruptcy, and the existence of a Nigerian proceeding involving the same claims and parties are all circumstances Nigerian Exploration labels as exceptional.  The Trustee counters that, while this proceeding is related to Nigerian events that gave rise to Nigerian legal claims, some of which are being litigated in Nigerian courts, there is nothing exceptional about this Court's adjudication of a proceeding related to Erin Petroleum's bankruptcy.  Ultimately, this case does present an exceptional circumstance warranting abstention.

Nigerian Exploration's request argues that Nigeria's interest in this proceeding outweighs this Court's interest in overseeing the orderly administration of Erin Petroleum's estate.  Balancing those interests requires consideration of five factors:

(1)    The effect or lack thereof on the efficient administration of the estate if the court recommends abstention;

(2)    The extent to which state law issues predominate over bankruptcy issues;

(3)     The difficult or unsettled nature of applicable law;

(4)     The presence of related a proceeding commenced in state court or other non-bankruptcy forum; and

(5)     International comity concerns.

*See Hous. Baseball Partners LLC v. Comcast Corp. (In re Hous. Reg'l Sports Network, L.P.)*, 514 B.R. 211, 215 (Bankr. S.D. Tex. 2014) (identifying the 14 factors courts apply to abstention requests involving domestic disputes); *Bozel*, 434 B.R. at 102–06 (considering four of the five factors in an international abstention dispute); *CPW Acquisition*, 2011 WL 830556, at *6–8 (considering whether four of the five factors supported permissive abstention in favor of a foreign forum).[13]  Implicit in these factors is a consideration of the proceeding's status under § 157(b)(2) and *Stern* as a core or non-core matter.  *See Hous. Reg'l Sports*, 514 B.R. at 215; *CPW Acquisition*, 2011 WL 830556, at *6, 8 (explaining that the proceeding's unrelatedness to the distribution of the debtor's assets weighed in favor of abstention).

        1.     *Abstention Will Not Adversely Affect the Estate's Efficient Administration*

Permissive abstention must not significantly impair the Court's administration of the estate. *Republic Reader's Serv. v. Magazine Serv. Bureau, Inc. (In re Republic Reader's Serv., Inc.)*, 81 B.R. 422, 426 (Bankr. S.D. Tex. 1987) (citing *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 483 (1940)).  Nigerian Exploration contends abstention will have little effect on the estate's administration as Erin Petroleum is in a liquidation that requires little judicial oversight.  (ECF No. 35 at 44).  The Trustee counters that this adversary proceeding implicates the claims allowance

---

[13] While courts in the Fifth Circuit recognize 14 factors relevant to a permissive abstention determination under § 1334(c)(1), only a few of those factors are relevant here—where the alternative forum is a foreign court. *Compare Hous. Reg'l Sports*, 514 B.R. at 215 (identifying 14 factors relevant to a permissive abstention analysis), *with CPW Acquisition*, 2011 WL 830556, at *6–8 (considering (1) the "effect of abstention, or lack thereof, on efficient administration of estate," (2) the "extent to which English law issues predominate," (3) the "difficult or unsettled nature of the applicable law," and (4) the "presence of a related proceeding commenced in another non-bankruptcy forum" in applying § 1334(c)(1)).

process, which the Court must necessarily oversee.   (ECF No. 42 at 18–19).   Ultimately, adjudication of the Trustee's claims in another forum will have little effect on the Court's ability to administer Erin Petroleum's estate.

The Trustee's invocation of the claims allowance process is unavailing.  According to the Trustee, his claims are counterclaims to Nigerian Exploration's proof of claim, which must be resolved as part of the claims allowance process.   But *Stern* curtailed bankruptcy courts' authority to finally adjudicate estate counterclaims arising under non-bankruptcy law.  564 U.S. at 482, 487. Bankruptcy courts' limited authority to adjudicate common law counterclaims extends only to counterclaims that "would necessarily be resolved in the claims allowance process."  *Id.* at 499. Put simply, labeling a common law claim as "a counterclaim to a proof of claim" will not necessarily trigger the claims allowance process.  Rather, a claim's substance will dictate whether it must be resolved in the claims allowance process.  *See, e.g., Gomez v. Saenz (In re Saenz)*, No. 13-70423, 2016 WL 9021733, at \*4 (Bankr. S.D. Tex. Dec. 19, 2016), *subsequently aff'd sub nom. Saenz v. Gomez*, 899 F.3d 384 (5th Cir. 2018) (explaining that non-dischargeability findings require determinations about a claim's validity and the value of the claimant's right to payment, even if the non-dischargeable claim arises under state law).  The Trustee cannot invoke the claims allowance process by simply characterizing the claims as "counterclaims."

The allowance or disallowance of Nigerian Exploration's proof of claim does not require resolution of the Trustee's counterclaims.  By its proof of claim, Nigerian Exploration "preserved" claims   for   "damages . . . and/or   specific   performance   [arising   from   the]   wrongful (including . . . without limitation fraudulent) or attempted transfers of interests in the [OLMs and seized oil]."   (ECF No. 42-1 at 6).   However, Nigerian Exploration would only assert its "preserved" claim "in the event that it is determined that [Erin Petroleum] own[s] or hold[s]

interests in the [seized oil or OMLs]." (ECF No. 42-1 at 5–6). Hence, the allowance or disallowance of Nigerian Exploration's claim depends on a threshold determination that Erin Petroleum held an interest in the seized oil or OMLs. And the Court would reach the validity of Nigerian Exploration's "preserved" claims only after making that threshold determination.

The Trustee's contention turns on whether resolving the threshold or validity issues requires a resolution of the Trustee's counterclaims. *Stern*, 564 U.S. at 497–98 (explaining that a counterclaim would not be resolved in the claims allowance process because resolving the primary proof of claim would not require a resolution of *all issues* presented by the counterclaim). Resolving those issues does not require the resolution of the Trustee's counterclaims. Nigerian Exploration's proof of claim poses, essentially, two issues: (1) whether, under Nigerian law, Erin Petroleum acquired an ownership interest in the OMLs or seized oil; and (2) if so, was Erin Petroleum's acquisition "wrongful" or "fraudulent." On the other hand, the Trustee's counterclaims present numerous issues. For instance: (1) whether the oil's seizure arose an from "irregularity or informality in the proceedings that led to the execution of process, the form of process, or the mode of execution," (ECF No. 60 at 13–14); (2) whether Nigerian Exploration is liable for conversion of the seized oil under Nigerian law, (ECF No. 60 at 14–16);[14] (3) whether Nigerian Exploration's alleged *knowing interference* with Erin Petroleum's contractual obligations proximately caused Erin Petroleum to suffer damages, (ECF No. 60 at 16–18); (4) whether Nigerian Exploration caused a trespass on Erin Petroleum's property, (ECF No. 60 at 18–19); and

---

[14] The Trustee's Amended Complaint alleges conversion under both Nigerian and Texas law but does not provide conversion's elements under either Nigerian or Texas law. Under Texas law at least, a defendant is liable for conversion if: "(1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant *unlawfully and without authorization* assumed and exercised control over the property . . . ; (3) *the plaintiff demanded return of the property*; and (4) *the defendant refused to return the property*." *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas 2009, pet. denied) (emphasis added). Assuming Nigerian law is similar, the claims allowance process would not address elements (2), (3), and (4). Similar issues pervade the Trustee's remaining claims.

(5) whether any of Nigerian Exploration's actions entitled Erin Petroleum's estate to recover monetary damages, (ECF No. 60 at 13–16, 18–19). While there may be some overlapping issues, the Trustee's counterclaims depend on far more than a threshold determination of title to the OMLs or seized oil. This divergence precludes resolution of the counterclaims in the claims allowance process. *See Stern*, 564 U.S. at 498 (holding that the claims allowance process does not encompass counterclaims requiring proof beyond proof necessary to justify a proof of claim's allowance or disallowance).

The Trustee also incorrectly categorizes his counterclaims as "core" matters. (ECF No. 42 at 9, 6–17). "Core" proceedings are those in which bankruptcy courts are empowered to enter final judgments. 28 U.S.C. § 157(b). Section 157(b)(2) provides a non-exhaustive list of proceedings that are statutorily core. § 157(b)(2). However, the Constitution limits § 157(b)'s application. *Stern*, 564 U.S. at 482 ("Although we conclude that § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on Vickie's counterclaim, Article III of the Constitution does not."). Article III only permits Congress to authorize bankruptcy courts to finally adjudicate "action[s that] stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 499. The Trustee is correct that his counterclaims are "core" under § 157(b)(2)(C), but the claims neither "stem[] from [Erin Petroleum's] bankruptcy" nor will they "necessarily be resolved in the claims allowance process." *Id.* at 482, 499. This Court lacks the constitutional authority to finally adjudicate such claims. *Id.* at 503. Thus, the Trustee's claims cannot be core matters. *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 35–36 (2014) (authorizing bankruptcy courts to treat *Stern* claims as non-core matters under § 157(c)).

The counterclaim's classification as non-core supports Nigerian Exploration's request for abstention. The Trustee's claims are textbook *Stern* claims, which if successful would "augment

the bankruptcy estate." 564 U.S. at 495. As *Stern* claims, Article III precludes this Court from adjudicating the claims without the parties' consent. *Id.* at 482; *Wellness Intern.*, 575 U.S. at 686. Since the Trustee's claims fall outside Article III's bankruptcy exception,[15] the claims' adjudication outside this Court will have little effect on the administration of Erin Petroleum's estate. *See, e.g., Ballard v. Milk Prods., LLC (In re Ballard)*, No. 12-30138, 2012 WL 4162382, at *2 (Bankr. S.D. Tex. Sept. 19, 2012) ("With respect to the request for abstention, the Court notes that it could not conduct a trial in this adversary. . . . [T]he State Court is in the best position to liquidate [person injury] claims."). A conclusory denial is all the Trustee offers to rebut Nigerian Exploration's argument that the Trustee's claims' adjudication elsewhere will have little effect on the estate's administration. *Cf. Premier Pipe, LLC v. J.D. Fields & Co., Inc. (In re Hallwood Energy, L.P.)*, No. 09-31253-H4-11, 2009 WL 2601294, at *10 (Bankr. S.D. Tex. Aug. 24, 2009) ("Factor number one applies here and supports permissive abstention because there is no evidence in the record that abstention would have a detrimental effect on the administration of the Debtor's estate.").

Under *Stern*, the Trustee could pursue his counterclaims before the District Court. 28 U.S.C. § 157(c)(1); *see also Arkison*, 573 U.S. at 38. While that process would liquidate the Trustee's claims, they would no longer be consolidated with all other disputes involving Erin Petroleum. Yet that consolidation underlies the Trustee's opposition to abstention.

The Trustee's claims arise under Nigerian law, their litigation is already pending in Nigeria, and there is nothing in the record suggesting that Nigeria's retention of the proceeding will disrupt Erin Petroleum's bankruptcy. *See Republic Reader's*, 81 B.R. at 426, 429–30 ("Where a cause of action for monetary damages based primarily on state law can be litigated in state court without

---

[15] *See Wellness Intern.*, 575 U.S. at 690 (Roberts, C.J., dissenting) ("Our precedents have[, in addition to 'public rights',] recognized an exception to the requirements of Article III for certain bankruptcy proceedings.").

substantial delay and disruption to the orderly administration of the estate, the best forum for resolution of that action is state court . . . ."). If the Trustee is successful, nothing prevents this Court from administering funds recovered from a Nigerian suit. *See, e.g., id.* at 430 ("Once contract liability is resolved elsewhere, [the court] will determine any issues relating to the administration of any funds accruing to the estate, or any resulting claim asserted against the estate."). The claims' adjudication in Nigeria will not adversely affect the estate's administration.

### 2.   *Non-Bankruptcy Law Predominates Over the Trustee's Suit*

The Trustee's claims arise under non-bankruptcy law. The Trustee concedes that his claims likely arise under Nigerian law. (ECF No. 42 at 35). None of the claims implicate the Bankruptcy Code and the claims' resolution does not depend on bankruptcy rights. The claims' non-bankruptcy foundation supports abstention. *Hassell Constr. Co. Inc. v. Royce J. Hassell (In re Hassell)*, No. 19-30694, 2020 WL 728890, at *3 (Bankr. S.D. Tex. Jan. 7, 2020).

### 3.   *The Trustee's Claims Depend on Difficult Questions of Nigerian Law*

The Trustee's claims' resolution presents difficult questions of Nigerian law.[16] Nigerian courts, with expertise in Nigerian law, would undoubtedly be more adept at answering those difficult questions.

Neither party contends the Trustee's claims depend on unsettled questions of law. Rather, the parties' disagreement centers on the difficulty an application of Nigerian law would present to this Court. Underlying this disagreement is a more fundamental dispute over the nature of Erin Petroleum's interest in the seized oil. Nigerian Exploration expresses its concern by arguing that the "local action doctrine," which requires that real property disputes be litigated in the forum in

---

[16] Texas's choice-of-law rules apply to the Trustee's claims. *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010). Under Texas's rules, the law of the forum with which the claims have the "most significant relationship" applies. *Id.* at 723. Here, the Trustee's allegations suggest Nigerian law would almost undoubtedly apply.

which the real property is located, deprives the Court of subject matter jurisdiction. (ECF No. 35 at 27–29). This concern strikes at the heart of the Court's international comity analysis. *See CPW Acquisition*, 2011 WL 830556, at *7 (citing *Maxwell Commc'n Corp. plc v. Société Générale (In re Maxwell Commc'n Corp. plc)*, 93 F.3d 1036, 1049 (2d Cir. 1996)) ("[A] threshold inquiry for determining issues of international comity is whether there exists an actual conflict between United States law and foreign law."). And international comity affects the permissive abstention analysis. *See id.* (relying, in part, on international comity to determine whether the "difficult or unsettled nature of the applicable law" favored permissive abstention).

Ultimately, the local action doctrine, while lending little to Nigerian Exploration's request for dismissal alone, encompasses concerns supporting abstention here. *Cf. Hayes v. Gulf Oil Corp.*, 821 F.2d 285, 290 (5th Cir. 1987) ("The local action rule prevents courts unfamiliar with local property rights and laws from interfering with title to real property which must be recorded under a unitary set of rules to keep it free of conflicting encumbrances."). The local action doctrine imposes a jurisdictional limitation on litigants by requiring "local action[s] involving real property [to] be brought within the territorial boundaries of the state where the land is located." *Boaz Legacy, L.P. v. Roberts*, 628 F. App'x 318, 319 (5th Cir. 2016) (quoting *Hayes*, 821 F.2d at 287). Here, Texas's local action doctrine would apply. *See id.* (citing *Tr. Co. Bank v. U.S. Gypsum Co.*, 950 F.2d 1144, 1149 (5th Cir. 1992)) ("The law of the forum state determines whether an action is local . . . ."). Under Texas law, actions to establish title to real property are "local." *Bailey*, 609 F.3d at 721 (5th Cir. 2010) (citing *Hayes*, 821 F.2d at 287).

Nigerian Exploration's argument that the Trustee's action is "local" overlooks that Nigerian law must treat the parties' competing interests (whatever they may be) in the seized oil and OMLs as real property interests. For instance, under Texas law, minerals in the ground are

real property but become personal property once extracted. *Rogers v. Ricane Enters., Inc.*, 930 S.W.2d 157, 165 (Tex. App.—Amarillo 1996, writ denied), *as modified on reh'g* (Sept. 18, 1996) (citing *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 817 (Tex. 1974)).  Hence, an action to recover extracted minerals based on some contractual right would not be a "local action" under Texas law.

Nigerian Exploration maintains, without opposition, that Nigerian law treats minerals "in under or upon any land in Nigeria" as property of Nigeria.  (ECF No. 35 at 13–14).  Nigeria's government, exclusively, may offer parties certain rights to explore and produce minerals.  (ECF No. 35 at 14).  Indeed, Nigeria's ownership of minerals in or upon the land resembles a Texas landowner's interest in minerals underneath the landowner's fee simple estate—a real property right.  But it is not clear from the Nigerian authorities that the two interest are identical.  That is, whether Texas's local action would apply to a dispute concerning competing interests in seized oil or upstream mineral rights under Nigerian law.  Moreover, the Trustee's claims turn on the validity of Erin Petroleum's interest in Nigerian governmental grants (*i.e.,* the OMLs).  (ECF No. 42 at 27–28).  However, neither Nigerian Exploration nor the Trustee offers Nigerian authority classifying these grants as real property interests, much less interests encompassed by the local action doctrine. *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

Nevertheless, the fact that Nigerian law classifying these interests may diverge from analogous domestic law suggests that an application of Nigerian law could prove difficult. *Cf. CPW Acquisition*, 2011 WL 830556, at *7 (concluding that the prospect of a U.S. court and a

foreign court reaching different conclusions when applying foreign law supported abstention based on the difficulty of the law's application); *Turner Ent. Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1521 (11th Cir. 1994) ("Although Turner attempts to present the case as a garden variety contract action, there are complicated issues surrounding the case that require extensive knowledge of the European television market."). The Trustee's claims may depend on either Erin Petroleum's ownership of and right to possess the seized oil or Erin Petroleum's production rights under the OMLs. (*See, e.g.,* ECF Nos. 35 at 60; 42 at 36). These interests arise under Nigerian law and may depend on the Nigerian government's consent. Ensuring those interests are properly characterized and their validity accurately determined requires a precise application of Nigerian law and an acute understanding of Nigeria's sovereign interest in Erin Petroleum's Nigerian operations. While federal courts are certainly capable of such undertakings, it will undoubtedly be difficult. Difficulty is all that is required to support permissive abstention. *See CPW Acquisition*, 2011 WL 830556, at *7.

### 4.    *A Proceeding Based on the Same Facts Exists in Nigeria*

The parties agree that the seizure's validity is currently being litigated in Nigeria's courts. But the Trustee maintains that this adversary proceeding is independent of the Nigerian proceeding, as the Trustee has asserted different claims before this Court. Nigerian Exploration accuses the Trustee of relying on mere semantics to avoid abstention.

Following Nigerian Exploration's seizure, Erin Petroleum moved, in a Nigerian court, to set aside the Writ of Attachment. (ECF No. 35-9 at 3–4). There, Erin Petroleum claimed it was entitled to relief from the Writ because:

1. Erin Petroleum . . . [was] the owner of the [seized oil].

2. The Writ of Attachment and Sale of Goods . . . did not authorize the [attachment of the seized oil].

3. The Writ of Attachment and Sale of Goods . . . did not authorize the attachment of any asset or any property claimed or perceived or stated to have been attached . . . pursuant to the Writ of Attachment . . . .

(ECF No. 35-9 at 4–5). In the same proceeding, Erin Petroleum also asserted "Claims for Goods and Damages." (ECF No. 35-10 at 3). Erin Petroleum's "Claims" included:

a.) [A] Declaration that upon the admissions of [Nigerian Exploration] and other available evidence the [seized oil] belong[ed] to [Erin petroleum].

b.) [A] Declaration that the purported attachment of [Erin Petroleum's oil] . . . at the insistence, instigation, and on account of [Nigerian Exploration] . . . was wrongful, invalid, irregular malicious and in bad faith.

c.) An Order setting aside the purported attachment at the insistence of [Nigerian Exploration] . . . .

d.) The total sum Claimed . . . for the loss to [Erin Petroleum] including but not limited to:

1.) Substantial economic losses, irreversible damages resulting from the disruption of [Erin Petroleum's] business operations;

2.) Economic and reputational damages resulting from interference with and inability to meet with contractual obligations to 3rd Parties dependent on the operation of the [OMLS];

3.) Loss of value in the shares of [Erin Petroleum's] parent company which is a listed company and which value is closely tied among other things to the operations of the [OMLs].

(ECF No. 35-10 at 7–8).

The Trustee's request for relief here and the allegations supporting that request are substantially similar to Erin Petroleum's claims in the Nigerian proceeding.

| Trustee's Claim | Amended Complaint | Erin's Nigerian Claims |
|---|---|---|
| Wrongful Attachment | NAE attached and seized control of the FPSO and the crude oil stored in it despite knowing that none of | [Nigerian Exploration] in the course of and during the Arbitration proceeding . . . admitted, acknowledged and even |

| Trustee's Claim | Amended Complaint | Erin's Nigerian Claims |
|---|---|---|
| | the production rights under the PSC, the FPSO, or the produced oil stored on the FPSO, were property of Judgment Debtors and were, therefore, outside the scope of the Writ. . . . NAE's wrongful attachment denied EPNL of the right to possession and enjoyment of the seized property that belonged to EPNL. 42. NAE's wrongful seizure of the FPSO and stored crude oil made it both physically and legally impossible for EPNL to offload the crude oil . . . . Because NAE's seizure prevented EPNL from offloading the crude oil on the FPSO, EPNL was forced to suspend its operations in the Oyo Field and shut in the Oyo-8 well, resulting in significant damages to EPNL. . . . NAE's wrongful attachment caused EPNL to suffer damages equal to the value of (a) what it would have realized from the sale of the crude oil stored on the FPSO, (b) EPNL's interest in the oil that would have been produced but for the shut in of the Oyo-8 well, (c) loss of value of the future production from the OMLs, and (d) the other losses EPNL suffered as a consequence of shutting in the Oyo-8 well, including the loss of its production rights in OMLs 120 and 121 under the PSC. The Trustee is also entitled to recover punitive damages. (ECF No. 60 at 12–13). | contended that the [seized oil was] the propert[y] of and belonged to [Erin Petroleum] . . . As result of the said wrongful execution on the [seized oil], which also affects the [OMLs and FPSO], [Erin Petroleum] has suffered serious and substantial damages for [Nigerian Exploration] having caused, instigated and promoted the wrongful execution and attachment and as such [Erin Petroleum] is lawfully entitled to compensation . . . . The total sum Claimed . . . [includes]: . . . (a) [A] Declaration the purported attachment of the [seized oil] at the instance of [Nigerian Exploration] . . . by the Deputy Sheriff of the Court at the instance, instigation, and on account of [Nigerian Exploration] when [Nigerian Exploration] indeed knew and had admitted that the [seized oil and the OMLs] actually belonged to [Erin Petroleum] . . . was wrongful, invalid, irregular malicious and in bad faith. . . . (1) substantial economic losses, irreversible damages resulting from the disruption of [Erin Petroleum's] business. . . . (ECF No. 35-10 at 6–8). |
| Conversion | Nigerian law recognizes claims for conversion as to both real and personal property. Moreover, conversion may be predicated on interference with ownership or the right of possession. . . As alleged | As result of the said wrongful execution on the [seized oil], which also affects the [OMLs and FPSO], [Erin Petroleum] has suffered serious and substantial damages for [Nigerian Exploration] having caused, instigated and promoted the wrongful |

| Trustee's Claim | Amended Complaint | Erin's Nigerian Claims |
|---|---|---|
| | herein, EPNL owned both real and personal property converted by NAE. EPNL is the assignee of certain interests in the OMLs and owns 100% of the production rights under the PSC. It was also the operator of the Oyo Field and chartered the FPSO. It owned the produced crude oil stored on the FPSO and the future production from the Oyo Field. It owned the right to sell the crude oil stored on the FPSO. . . . On January 31, 2018, NAE utilized armed personnel to seize control of the FPSO and chain and counter-lock its main export valve, thereby depriving EPNL of its use and possession of the FPSO and the crude oil stored there. Those actions directly caused the shut-in of the Oyo-8 well. . . NAE's wrongful attachment and seizure of the FPSO and crude oil prevented EPNL from offloading and selling the crude oil stored at the FPSO as well as any oil that would have been produced and sold but for the shut-in of the Oyo-8 well. Those actions caused EPNL significant damages equal to the value of (a) what it would have realized from the sale of the crude oil stored on the FPSO, (b) EPNL's interest in the oil that would have been produced but for the shut in of the Oyo-8 well, and (c) the other losses EPNL suffered as a consequence of shutting in the Oyo-8 well, including the lost value of its production rights in the OMLs under the PSC. . . . NAE's actions in boarding the FPSO and counter-locking the valve exhibited a clear repudiation of EPNL's rights in the FPSO, stored oil, future production, | execution and attachment and as such [Erin Petroleum] is lawfully entitled to compensation . . . . The total sum Claimed . . . [includes]: . . . . (1)     substantial economic losses, irreversible damages resulting from disruption of [Erin Petroleum's] business operations; . . . (3) loss of value in the shares of [Erin Petroleum's] parent company which is a listed company and which value is closely tied . . . to the operations of the [OMLs]. (ECF No. 35-10 at 6–8). |

| Trustee's Claim | Amended Complaint | Erin's Nigerian Claims |
|---|---|---|
| | PSC, and OMLs. That clear repudiation of EPNL's rights excuses any failure by EPNL or the Trustee to demand the return of the property. (ECF No. 60 at 14–16). | |
| **Tortious Interference with Erin Petroleum's Contracts** | EPNL had a valid contract with Glencore for the offtake of oil produced from the Oyo Field. EPNL was also the assignee of rights in the OMLs and was, therefore, the beneficial owner of the rights granted in those OMLs. EPNL owned the production rights under the PSC and operated the Oyo-8 well. . . . NAE was fully aware of the PSC. As a prior operator under the PSC, NAE knew that the FPSO had limited storage capacity . . . . The existence of the FPSO charter and the offtake contract with Glencore had been disclosed by EPNL's parent company in public filings. . . . NAE attached and seized control of the FPSO and crude oil despite knowledge that neither the FPSO nor the crude oil stored there were property of the Judgment Debtors and with knowledge of the contacts to which EPNL was a party related to the OMLs and the FPSO. NAE knew that the OMLs, the FPSO, and the stored crude oil were outside the scope of the Writ. . . . NAE's wrongful attachment and seizure of the FPSO and crude oil proximately caused injury to EPNL by preventing EPNL from offloading and selling the crude oil stored at the FPSO, as well as any oil that would have been produced and sold in the future but for the shut-in of the Oyo-8 well. EPNL suffered damages equal to the value | [Nigerian Exploration] in the course of and during the Arbitration proceeding . . . admitted, acknowledged and even contended that the [seized oil was] the propert[y] of and belonged to [Erin Petroleum] . . . As result of the said wrongful execution on the [seized oil], which also affects the [OMLs and FPSO], [Erin Petroleum] has suffered serious and substantial damages for [Nigerian Exploration] having caused, instigated and promoted the wrongful execution and attachment and as such [Erin Petroleum] is lawfully entitled to compensation . . . . The total sum Claimed . . . [including]: . . . (2) economic and reputational damage resulting from interference with and inability to meet with contractual obligations to 3rd Parties dependent on the operation of the [OMLs]; (3) loss of value in the shares of [Erin Petroleum's] parent company which is a listed company and which value is closely tied . . . to the operations of the [OMLs]. (ECF No. 35-10 at 6–8). |

| Trustee's Claim | Amended Complaint | Erin's Nigerian Claims |
|---|---|---|
| | of (a) what it would have realized from the sale of the crude oil stored on the FPSO, (b) EPNL's interest in the oil that would have been produced but for the shut in of the Oyo-8 well, (c) the other losses EPNL suffered as a consequence of shutting in the Oyo-8 well, including the lost value of its production rights in the OMLs under the PSC, and (d) punitive damages. (ECF No. 60 at 16–18). | |

Some differences do exist between the Trustee's Amended Complaint and Erin Petroleum's claims in Nigeria. For instance, Erin Petroleum's Nigerian pleadings do not neatly label the claims as: (1) wrongful attachment; (2) conversion; and (3) tortious interference with existing contracts. And Erin Petroleum's Nigerian pleadings do not contain a claim for trespass[17] or an objection to claim. Finally, the Trustee's Amended Complaint arguably contains more detailed factual allegations about the actual seizure. Still, it is undeniable that the Trustee's Amended Complaint and Erin Petroleum's Nigerian pleadings seek, essentially, identical damages, arising from identical events, based on identical legal rights.

Despite the Trustee's contentions, Erin Petroleum initiated a related proceeding in another forum based on claims that became property of the estate. That proceeding's existence supports this Court's abstention. *See Noble Drilling Servs., Inc. v. Noble Denton Marine, Inc.*, No. CIV.A. 4:09-CV-3074, 2010 WL 1790202, at \*4 (S.D. Tex. May 4, 2010) (quoting *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 232 (4th Cir. 2000)) ("The threshold question in [the abstention] analysis involves a determination of whether the two suits are actually 'parallel,' which

---

[17] The Trustee does not allege that he would be unable to amend the Nigerian pleadings to include a claim for trespass.

happens when substantially the same parties litigate substantially the same issues in different forums." (quotation cleaned up)).

### 5. International Comity Supports Abstention

Nigerian Exploration raises concerns that this Court's exercise of jurisdiction over the Trustee's claims will run afoul international comity. International comity is the mutual respect one nation's courts accord to the actions of another nation's courts and other instrumentalities. *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895). Under this principle, a court may abstain from exercising jurisdiction "in deference to the laws and interest of a foreign nation." *Bozel*, 434 B.R. at 106 (citing *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987)).[18] Three considerations, generally, guide a court's application of international comity: "(1) a proper level of respect for the acts of our fellow sovereign nations; (2) fairness to litigants; and (3) efficient use of scarce judicial resources." *Bozel*, 434 B.R. at 107 (quoting *Turner Ent.*, 25 F.3d at 1518) (quotation cleaned up); *accord Ungaro-Benages*, 379 F.3d at 1238 ("[F]ederal courts evaluate several factors [when applying international comity prospectively], including the strength of the United States' interest in using a foreign forum, the strength of the foreign governments' interests, and the adequacy of the alternative forum.").

Nigerian Exploration focuses its argument on the first two factors, contending that this Court's adjudication of the Trustee's claims would disregard Nigeria's sovereign interest in the claims' resolution. The Trustee counters that comity is not offended "when [the] state law claims at issue . . . . are not novel issues and do not present a countervailing state interest in their

---

[18] International comity, at the motion-to-dismiss stage, comes in two forms: prospective comity and retrospective comity. *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004). A prospective application occurs when a case is stayed or dismissed in favor of its resolution in a more appropriate forum. *Id.* (citing *Bi v. Union Carbide Chems. & Plastics Co. Inc.*, 984 F.2d 582, 586–87 (2d Cir. 1993)). A retrospective application resolves the enforceability of a judgment rendered in a foreign parallel proceeding. *Id.* (citing *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246–50 (2d Cir. 1999)). Nigerian Exploration requests a prospective application of international comity.

resolution." (ECF No. 42 at 20–21). According to the Trustee, his claims do not present such issues. However, the Trustee's argument overlooks Nigeria's sovereign interest in this litigation's outcome. That sovereign interest, viewed through international comity's lens, supports abstention. By exercising jurisdiction over this dispute, the Court risks failing to accord Nigeria and its laws a sufficient level of respect. *See Turner Ent.*, 25 F.3d at 1521 (identifying a nation's interest in regulating the use of the nation's broadcast technology). Both Nigerian Exploration and the Trustee recognize Nigeria exercises immense control over its mineral resources. (*See* ECF No. 42 at 29–33). In fact, Nigeria's Petroleum Ministry has appeared in the Nigerian proceeding and asserted a claim to proceeds from the seized oil's sale. (*See generally* ECF No. 35-21). The Trustee relies on the limited scope of Nigeria's intervention to argue that Nigeria has little interest in the outcome of this dispute. (ECF No. 42 at 21–23). That argument gives short shrift to Nigeria's interest.

The Trustee repeatedly asserts that Nigerian Exploration lacks standing to challenge Erin Petroleum's rights in the seized oil. Yet the parties disagree over the status of those rights under Nigerian law. Nigerian Exploration maintains that the Trustee failed to even plead Erin Petroleum had rights in the "OMLs, the [seized] oil produced therefrom, or the FPSO lease[]." (ECF No. 35 at 58). Nigerian Exploration reaches this conclusion based on the absence of any allegation that Erin Petroleum received ministerial consent when it acquired rights in the OMLs and the Production Sharing Contract. (ECF No. 35 at 58). The Trustee counters that the requested relief simply requires the Court to enforce Erin Petroleum's existing property rights, which stem from Erin Petroleum's acquisition of the Production Sharing Contract. (ECF No. 42 at 27–28). Yet the Trustee fails to address whether ministerial consent was necessary to consummate that acquisition

and whether a lack of consent renders Erin Petroleum's "existing property right" unenforceable. (*See* ECF No. 42 at 29–30; *see also generally* ECF No. 60).

Critically, the Trustee identifies Nigeria's Petroleum Minister as the party with standing to challenge Erin Petroleum's rights—from which "[t]he Trustee's claims all stem." (ECF No. 42 at 27–30). If the Trustee's claims "stem from rights [Erin Petroleum] obtained [in] . . . the Production Sharing Contract," that implies Erin Petroleum's rights must necessarily be valid to support the Trustee's claim for relief. (ECF No. 42 at 27–28). Nigeria Exploration raises serious questions about the validity of Erin Petroleum's rights in the seized oil. Those questions in turn raise questions of Nigerian law that, based on the parties' pleadings, may be unresolved in Nigerian jurisprudence. (*Compare* ECF No. 35 at 58–59, *with* ECF No. 42 at 30). Nigeria likely provides a better forum for resolving those questions of Nigerian law. *See CHC Grp.*, 2017 WL 1380514, at *22 ("[I]t is likely that French law will apply to the claims asserted in the Adversary Proceeding and that France has the most vested interested in determining those claims."). If, as the Trustee argues, Nigeria Exploration is not in a position to challenge the Trustee's claims' validity, Nigeria itself may have a significant interest in settling those "unclear questions of law."

For instance, if this Court were to move forward adjudicating the Trustee's claims, it would have to determine the validity of Erin Petroleum's interest in the seized oil. That determination would be made after considering whether Nigeria Exploration has standing to weigh in on the validity of Erin Petroleum's interest. Both determinations present questions of Nigerian law. The Petroleum Ministry's rights may be impaired if this Court's answer to either question is inconsistent with Nigerian law. Indeed, if this Court found that Erin Petroleum held a legitimate interest in the seized oil without considering the Petroleum Minister's position, that decision could foreclose Nigeria from asserting its own interest in the seized oil (or the OMLs) in the future. *See*

*Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 593 (5th Cir. 2003) (citing *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985)) ("The rationale underlying the grant of comity to a final foreign money judgment is similar to that underlying the application of res judicata . . . . [O]nce the parties have had an opportunity to present their cases fully and fairly before a court of competent jurisdiction, the results of the litigation process should be final."). That decision could also motivate other parties to choose to adjudicate their disputes in forums where foreign sovereigns are not required to appear.[19] Such outcomes undermine international comity's fundamental aim—respect for the rights and interests of other sovereignties. *See Pimentel*, 553 U.S. at 866 ("The dignity of a foreign state is not enhanced if other nations bypass its courts without right or good cause.").

Also of great importance is the role of the Nigerian Sheriff. Sheriffs are officers of the Nigerian judiciary. (ECF No. 35 at 7 n.6). Resolving the Trustee's claims would require this court to determine whether the Sheriff, an officer of a foreign court, exceeded his authority while acting under a Nigerian court order within Nigerian-controlled waters. This Court declines to exercise such intrusive jurisdiction. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 304 (1918) ("To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.").

Though Nigeria's Petroleum Minister has yet to appear and assert the Ministry's interest in this dispute, such an interest certainly exists. In fact, the Ministry, through its own regulatory

---

[19] Of course, Nigeria could voluntarily appear before this Court. In fact, Nigeria may even be a necessary party to this dispute based on the interest Nigeria has in the regulation of its minerals. *See In re Republic of Philippines*, 309 F.3d 1143, 1152 (9th Cir. 2002) (concluding that a foreign nation was an "indispensable party" under Rule 19 because its interest in property was not adequately represented by the existing litigants). However, Nigeria and its instrumentalities have an absolute right to not appear. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 865–66 (2008).

process, revoked the OMLs in which Erin Petroleum claims an interest and from which the seized oil was produced.  (*See* ECF No. 35-18).  Tellingly, that revocation was addressed to Allied, not Erin Petroleum, lending legitimacy to Nigeria Exploration's challenge to the interest on which the Trustee bases his claims.  (*See* ECF No. 35-18 at 2).

In sum, the parties have a genuine dispute over the legitimacy of Erin Petroleum's interest in the seized oil.  The Trustee admits that his claims "stem" from Erin Petroleum's interest in the OMLs and seized oil.  Thus, the Trustee's success must be predicated on a finding that Erin Petroleum's interest was legitimate.  Nigeria's Petroleum Ministry may be the only party that can challenge Erin Petroleum's purported interest.  Nigeria has an interest in using its courts to decide such disputes.  *Pimentel*, 553 U.S. at 866 ("There is a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so.").

Compared to Nigeria's interest in this proceeding (*i.e.,* rights to property over which the government exercises total control), the United States' interest is minute.  Though the U.S. has established a comprehensive bankruptcy system to facilitate the collection and distribution of debtors' assets (*e.g.,* unliquidated claims held by the debtor), that system recognizes some disputes related to bankruptcy must be resolved outside the bankruptcy proceeding itself.  *See, e.g.,* 28 U.S.C. § 1334(c)(1)–(2).  And the Constitution, which empowers Congress to enact bankruptcy laws, demands that some claims held by debtors be adjudicated outside bankruptcy court. *See Stern*, 564 U.S. at 494 ("What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime." (emphasis in original)).  These exceptions confirm that there

is no danger in authorizing a non-bankruptcy forum to adjudicate a proceeding related to a bankruptcy, which may have a positive impact on creditors' recoveries.

Here, the non-bankruptcy forum (*i.e.,* Nigeria) will likely be more capable of correctly and efficiently resolving this dispute. *See CHC Grp.*, 2017 WL 1380514, at *22 ("[I]t is likely that French law will apply to the claims asserted in the Adversary Proceeding and that France has the most vested interested in determining those claims."). Allowing a more suitable forum to resolve this dispute will hardly undermine the U.S.'s interest in the centralized administration of the Erin Petroleum's estate. *See Republic Reader's*, 81 B.R. at 426, 429–30 ("Where a cause of action for monetary damages based primarily on state law can be litigated in state court without substantial delay and disruption to the orderly administration of the estate, the best forum for resolution of that action is state court . . . ."). So long as the Trustee can enforce a money judgment resulting from this dispute, that money will become part of the estate and available for distribution to creditors. *See* 11 U.S.C. § 541(a)(1), (7) ("The commencement of a case under . . . this title creates an estate. Such estate is comprised of all the following property, *wherever located and by whomever held*: (1) . . . [A]ll legal or equitable interests of the debtor in property as of the commencement of the case. . . . (7) Any interest in property that the estate acquires after the commencement of the case." (emphasis added)).

Given Nigeria's sovereign interest in this dispute, the proceeding's focus on Nigerian law, and the U.S.'s minimal interest in having the dispute adjudicated by this Court, Nigeria offers a superior forum for this proceeding's resolution. *Cf. Turner Ent.*, 25 F.3d at 1521 ("[T]he public interest in the litigation is more conspicuous in [the foreign state], because the [foreign] parties include the [foreign] state broadcasters, and the salient issues in the case are of great moment to

the state of television in [the foreign state and its neighbors]. *There is no comparable federal interest in maintaining jurisdiction over the litigation*." (emphasis added)).

While Nigeria holds the superior interest in adjudicating this dispute, it must offer a fair forum for adjudication. *Bozel*, 434 B.R. at 107. Fairness, in an international comity context, generally demands that parties to a judgment have adequate notice and an opportunity to be heard. *See Int'l Transactions*, 347 F.3d at 594 (citing *Hilton*, 159 U.S. at 205–06) ("Under the law of the United States, a foreign judgment cannot be enforced in a U.S. court unless it was obtained under a system with procedures compatible with the requirements of due process of law."); *accord Turner Ent.*, 25 F.3d at 1519, 1522.[20] Prejudice resulting from a court's abstention based on international comity must also enter this fairness analysis. *See Turner Ent.*, 25 F.3d at 1522 ("Before accepting or relinquishing jurisdiction a federal court must be satisfied that its decision will not result in prejudice to the party opposing the stay."). Fairness's consideration ensures that parties are not denied an opportunity to "fully and fairly litigate their claims" before a foreign tribunal. *Id.*

Nigerian Exploration points to the existing Nigerian litigation as evidence that Nigeria offers a fair forum for the adjudication of the Trustee's claims. (ECF No. 35 at 46–47). Moreover, Erin Petroleum voluntarily appeared before the Nigerian court to assert its claim to the seized oil and request damages based on the seizure. (*See generally* ECF Nos. 35-8, 35-9, 35-10). The Trustee counters that Nigerian courts are functionally ill-equipped to handle this dispute, as COVID-19 forced the closure of Nigerian courts leading to a substantial case backlog. (ECF No.

---

[20] *Forum non conviens* informs the forum-adequacy analysis. *Ungaro-Benages*, 379 F.3d at 1238. In fact, the entire international comity analysis is "intertwined" with *forum non conveniens*. *Id.* at 1239 (citing *Ford v. Brown*, 319 F.3d 1302, 1304 n. 3 (11th Cir. 2003)).

42 at 24–26).  Neither party addresses whether Nigeria's justice system affords parties the requisite due process protections.

Both parties submitted declarations from Nigerian lawyers in support of their positions. The Trustee's supporting declaration paints a bleak picture of a dysfunctional court system, stymied by derelict infrastructure, inadequate technology, a global pandemic, and civil unrest. (ECF No. 42-5 at 2–4).  In contrast, Nigerian Exploration's supporting declaration counsels a measured assessment of the bleak picture the Trustee's declaration paints.  (ECF No. 47-1 at 2–3). Ultimately, the Trustee's concerns are belied by the fact that the Nigerian litigation has progressed (though not as far as the Trustee would hope).  (*See* ECF No. 63 at 8).  Further assuaging these concerns is Erin Petroleum's initial decision to seek relief from Nigeria's judicial system before using its bankruptcy to assert its claims before this Court through the Trustee.  That is, when Erin Petroleum intervened in the Nigerian proceeding in 2018, it viewed Nigeria's courts as an adequate forum to vindicate the same rights the Trustee seeks to vindicate here.

The Trustee identifies COVID-19 and the October 2020 "[E]nd[S]ars riots" as the only significant intervening events that reduced the adequacy of Nigeria as a forum to resolve Erin Petroleum's claims.  (ECF No. 42-5 at 3).  However, Nigerian courts began ameliorating COVID's negative impact as early as May 2020, two years ago.  (ECF No. 42-1 at 3; 47-1 at 3).  Just as this country has learned to live with COVID, the declarations confirm Nigeria has learned too.  And while the riots had a concerning impact on the justice system, the Trustee's supporting declaration clarifies that impact was limited to "some of the Court buildings and facilities" and says nothing of the specific impact on this case.  (ECF No. 42-1 at 3).  Moreover, the riots were more than 18 months ago.

Undoubtedly, COVID-19 (and perhaps the riots) hindered the Nigerian proceeding's progress, but those hinderances seem to be a thing of the past as the case is now moving forward. From the Trustee's declaration, it is also plausible that Nigerian courts lack the technology and infrastructure that are hallmarks of U.S. Courts.  Nevertheless, Nigerian Exploration's and Erin Petroleum's pre-bankruptcy choices demonstrate the adequacy of Nigeria's court system.  Nothing in the Trustee's declaration undermines that conclusion.  *See DTEX*, 508 F.3d at 796 ("*A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly*, even though they may not enjoy the all the benefits of an American court." (emphasis added)); *see also Turner Ent.*, 25 F.3d at 1522.

Neither the Trustee nor Nigerian Exploration suggests that prejudice will result from the Court's abstention.  *See Turner Ent.*, 25 F.3d at 1522 ("Before accepting or relinquishing jurisdiction a federal court must be satisfied that its decision will not result in prejudice to the party opposing the stay.").  The parties' silence is unsurprising given that the Trustee asserts claims for relief arising under Nigerian law and Erin Petroleum originally chose to request relief from a Nigerian court.  *See id.* ("We see nothing that has occurred in the [foreign] proceedings to indicate that staying the litigation will foreclose any chance for Turner to obtain a fair and just result."). By asserting claims under Nigerian law and seeking relief from a Nigerian court, Erin Petroleum (and now the Trustee) implicitly recognized that Nigeria's legal system would afford Erin Petroleum full and fair relief.  (*Accord* ECF No. 42 at 21).  Requiring the Trustee to consolidate his claims in the Nigerian proceeding will not result in prejudice to either party.

Prejudice could result if this Court retained jurisdiction over the Trustee's claims.  The Trustee argues that documentary evidence will dominate this case's adjudication and that the few witnesses required are also necessary to resolve Nigerian Exploration's proof of claim.  (ECF No.

42 at 25).  Still, those documents and witnesses will almost exclusively come from Nigeria.  In fact, the technological and infrastructure limitations identified by the Trustee could exacerbate potential prejudice to the parties.  (*See* ECF No. 42-5 at 2–3).  For instance, if a Nigerian witness needed to appear by videoconference due to COVID-19 travel restrictions, Nigeria's limited internet coverage could make that witness's appearance before this Court difficult or impossible. If the parties wish to have Nigerian witnesses appear in-person, adjudicating this dispute in Houston would require those witnesses to incur substantial administrative and travel expenses. These difficulties could deprive a party of the opportunity to present its full case.  Adjudicating this dispute in Nigeria would, almost certainly, ameliorate both problems.  Nothing in the parties' submissions suggests it would be more convenient to resolve this dispute in Houston.  *See Turner Ent.*, 25 F.3d at 1521–22 (noting that the location of witnesses and documents in a foreign forum supports abstention in favor of the foreign forum).  Nigeria is the proper forum to resolve this dispute.

As both this proceeding and the Nigerian proceeding are still in their infancy, the efficient use of judicial resources is not a predominate consideration.  *See id.* at 1522.  However, because this dispute's resolution depends on familiarity with Nigerian law and Nigerian evidence, this Court's adjudication of the dispute would be less efficient.  Nigerian legal experts and court-time devoted to their testimony would be necessary.  Delays in getting necessary documentary evidence or witnesses from Nigeria to Houston could necessitate continuances, which would further delay this suit's resolution.  Additional litigation could also result if a Nigerian court reaches a decision that conflicts with this Court's decisions.  These efficiency concerns support abstention.  *See id.* at 1522–23 (considering the potential for delay and piecemeal litigation to conclude that a foreign nation offered a more efficient forum).

The Trustee asks this Court to adjudicate a dispute arising under Nigerian law, that originated in Nigerian waters, between Nigerian parties, over Nigerian property. Erin Petroleum already initiated a Nigerian proceeding to vindicate the rights the Trustee asserts in this proceeding. The only tether between this dispute and Texas is Erin Petroleum's bankruptcy. Yet this dispute's resolution in Nigeria will have little effect on Erin Petroleum's estate's administration. Adjudicating this dispute here could, however, offend, or at least undermine, Nigeria's sovereign interest in regulating its mineral resources. Taken together, these factors justify abstention.

## III.   DISPOSITION OF THE TRUSTEE'S CLAIMS

While abstention is warranted, two disposition issues remain. First, whether dismissal is appropriate as opposed to abatement. Second, whether the Court can constitutionally enter a dismissal order under § 1334(c)(1).

### A.   The Trustee's Claims Should be Dismissed Without Prejudice

Nigerian Exploration seeks the abstention-based dismissal of the Trustee's damages claims. Under federal common-law abstention principles, such relief would be unavailable and Nigerian Exploration would have to settle for a stay. However, Nigerian Exploration relies on 28 U.S.C. § 1334(c)(1) for its requested relief. Under § 1334(c)'s abstention principles, damages actions can be dismissed.

Abstention is itself an exceptional remedy. *Colo. River*, 424 U.S. at 813. Generally, abstention-based dismissal is even more exceptional. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 731 (1996). Critical here, the Supreme Court has declined to recognize abstention-based dismissals in pure damages actions. *See id.* ("[F]ederal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary. Because this was a damages action, . . . the District Court's remand order was an

unwarranted application of the *Burford* doctrine.").   The Supreme Court's apprehension over dismissals in damages actions under federal abstention doctrines stems from these doctrines' foundations in equity.   *See id.* at 717, 721 (quoting *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 120 (1981) (Brennan, J., concurring)) ("[I]t has long been established that a federal court has the authority to decline to exercise its jurisdiction when it 'is asked to employ its historic powers as a court of equity.'").

While the Trustee asserts claims for damages here, § 1334(c) authorizes the abstention-based dismissal of the Trustee's claims.   Equitable abstention doctrines provide necessary exceptions to federal courts' otherwise "strict duty to exercise the jurisdiction . . . conferred on them by Congress."   *Id.* at 716.   That is, where Congress has not vested courts with discretion to decline Congress's jurisdictional grant, equitable abstention doctrines afford federal courts discretion to abstain when faced with "important countervailing interest[s]" (*e.g.,* "comity and federalism").   *Id.* at 716, 722–23.   This discretion is rooted in federal courts' "historic power as [courts] of equity."   *Id.* at 717.   Sitting in equity, courts traditionally had discretion to grant or deny relief, usually in cases involving injunctive or declaratory relief.   *Id.* at 718.   Within that equitable discretion, federal courts enjoy the ability to decline to exercise jurisdiction, despite Congress's conferral, and may dismiss equitable actions in favor of more appropriate forums.   *See id.* at 717 (quoting *McNary*, 454 U.S. at 120 (Brennan, J., concurring)) ("[I]t has long been established that a federal court has the authority to decline to exercise its jurisdiction when it 'is asked to employ its historic powers as a court of equity.'  This tradition informs our understanding of the jurisdiction Congress has conferred upon the federal courts, and explains the development of our abstention doctrines.").   Because damages actions are actions "at law," rather than "in equity," equitable abstention doctrines do not permit federal courts to fully abdicate their "strict duty" to exercise

jurisdiction through the damages action's outright dismissal. *See id.* at 719 ("[W]e have not previously addressed whether the principles underlying our abstention cases would support the remand or dismissal of a common-law action for damages. . . . [W]e have applied abstention principles to actions "at law" only to permit a federal court to enter a stay order . . . .").

Unlike judge-made equitable abstention doctrines, Congress created § 1334(c).  In doing so, Congress recognized that certain disputes are better resolved in non-bankruptcy forums, especially where bankruptcy is the sole basis for federal jurisdiction over the dispute.  *See Mugica v. Helena Chem. Co. (In re Mugica)*, 362 B.R. 782, 790–91 (Bankr. S.D. Tex. 2007) ("It is evident [in § 1334(c)(1)] that Congress intends that parties have the ability to obtain remand of a proceeding to state court if claims would be better litigated there.").  Unlike common law abstention doctrines, § 1334(c) is not a prudential exception to the otherwise "unflagging obligation" to exercise federal jurisdiction.  *See Colo. River*, 424 U.S. at 817.  Section 1334(c)'s Congressional enactment eschews equitable abstention's inherent risk—that an abstention-based dismissal will derogate Congress's jurisdictional choices.  *See Quackenbush*, 517 U.S. at 718 (noting that federal courts' "strict duty" to exercise their jurisdiction "explains the development of [equitable] abstention doctrines").

Courts regularly dismiss cases under § 1334(c)'s abstention provisions.  *See, e.g., Chapman v. Scurlock (In re Chapman)*, No. 18-70101, 2018 WL 4620719, at *8 (Bankr. S.D. Tex. June 8, 2018) (dismissing an action seeking, in part, damages based on permissive abstention under § 1334(c)(1)); *McClenon v. Statebridge Co., LLC (In re McClenon)*, No. 18-31864, 2019 WL 451241, at *1 (Bankr. S.D. Tex. Feb. 4, 2019) (dismissing tort claims based on permissive abstention under § 1334(c)(1)); *Hill v. Day (In re Today's Destiny, Inc.)*, No. 05-90080, 2009 WL 1232108, at *9 (Bankr. S.D. Tex. May 1, 2009) ("[A]ll [fraud] claims asserted against

Lenders, . . . are dismissed without prejudice in favor of a non-bankruptcy forum."); *Chamberlain Grp., Inc. v. Lear Corp. (In re Lear Corp.)*, No. 0914326 ALG, 2009 WL 3191369, at *1 (Bankr. S.D.N.Y. Sept. 24, 2009) (dismissing a patent infringement suit based on § 1334(c)(1)).  Here, § 1334(c)(1) warrants "the usual procedur[e] employed to 'abstain'"—dismissal without prejudice.  *See Brown v. Shepherd (In re Lorax Corp.)*, 295 B.R. 83, 90 (Bankr. N.D. Tex. 2003) ("The usual procedural device employed to 'abstain' is to dismiss the matter pending before the federal tribunal . . . .").[21]

### B.       The Bankruptcy Court Cannot Enter a Final Order on the Trustee's Claims

While appropriate, this Court lacks the constitutional authority to dismiss the Trustee's claims.  The Trustee's claims are non-core matters.  *See supra* at 30–35.  As non-core matters, the Constitution does not permit this Court to enter a final judgment on the Trustee's claims.  *Stern*, 564 U.S. at 482.  A dismissal without prejudice under § 1334(c)(1) is a "final judgment."  *See Pal Fam. Tr. v. Ticor Title Ins.*, 490 B.R. 480, 483 (S.D.N.Y. 2013) (recognizing a bankruptcy court's

---

[21] Nigeria's interest in this case justifies dismissal without prejudice as opposed to a stay pending the resolution of the Nigerian proceeding.  While Nigeria has not established a comprehensive administrative system for resolving disputes involving mineral interest, *see, e.g., Ungaro-Benages*, 379 F.3d at 1240–41 (dismissing a damages action in favor of a foreign dispute resolution system developed to handle such actions), this action would not be before this Court but for Erin Petroleum's bankruptcy, *contra Turner Ent.*, 25 F.3d at 1523 (staying a domestic proceeding over which the court had diversity jurisdiction in favor of a foreign parallel proceeding).  This dispute is best resolved solely by a Nigerian court.  *Cf. Republic Reader's*, 81 B.R. at 426 ("Where a cause of action for monetary damages based primarily on state law can be litigated in state court without substantial delay and disruption to the orderly administration of the estate, the best forum for resolution of that action is state court . . . ."); *see also Lorax Corp.*, 295 B.R. at 90 ("The usual procedural device employed to 'abstain' is to dismiss the matter pending before the federal tribunal . . . .").

Furthermore, all the Trustee's claims arise under Nigerian law. The Trustee has not offered any argument or evidence that his claims cannot be advanced in the Nigerian proceeding.  Nor has the Trustee suggested that he could not enforce a judgment from a Nigerian court in Nigeria.  Even if the Trustee is unable to enforce a judgment in Nigeria (against Nigerian Exploration, a Nigerian company), the Trustee could bring an independent action to enforce his judgment here.  *See Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1003 (5th Cir. 1990) ("Courts have frequently held that state law governs the recognition and enforcement of foreign country judgments."); TEX. CIV. PRAC. & REM. CODE ANN. § 36A.004 (West 2021) ("Except as otherwise provided in Subsections (b) and (c), a court of this state shall recognize a foreign-country judgment to which this chapter applies.").  In short, other than allocating funds Erin Petroleum may recover in the Nigerian proceeding, there is little this Court can offer the Trustee.

order dismissing a case without prejudice to be a final, appealable order); *Nat'l Gypsum Co. v. Prostok*, No. CIV. A. 3:98CV0869P, 2000 WL 1499345, at *9 (N.D. Tex. Oct. 5, 2000) ("This decision to abstain is the practical equivalent to a dismissal of the counterclaims and is considered final and appealable."); *see also Westlake Styrene Corp. v. P.M.I. Trading, Ltd.*, 71 F. App'x 442 (5th Cir. 2003) ("The dismissal without prejudice ended the litigation on the merits . . . . Thus, its order was a final decision, and we have appellate jurisdiction.").  Thus, this Court may only report to the District Court and recommend that the District Court abstain from exercising jurisdiction over the Trustee's claims and dismiss the claims without prejudice.  *See Arkison*, 573 U.S. at 36–37 (holding that *Stern* claims are non-core matters under 28 U.S.C. § 157(c)(1)).

## IV.   THE TRUSTEE'S CLAIM OBJECTION

In the Amended Complaint, the Trustee objected to Nigerian Exploration's proof of claim. By its proof of claim, Nigerian Exploration reserved the right to assert claims against Erin Petroleum's estate should the Court determine Erin Petroleum "own[ed] or h[eld] interests in" the OMLs or seized oil.  (ECF No. 42-1 at 6).  Nigerian Exploration premises its claim on a threshold determination that Erin Petroleum owned or held valid interests in the OMLs and seized oil.  The Trustee argues that Nigerian Exploration's proof of claim is facially deficient.  (ECF No. 60-1 at 20–21).  Without reaching the claim's sufficiency, its resolution necessarily requires a determination that Erin Petroleum did or did not own or hold valid interests in the OMLs and seized oil.  That determination is better left for Nigeria's courts.  The Trustee's objection is therefore abated pending the resolution of the Trustee's claims.  *Cf. In re Fairgounds Corp.*, No. CV 04-2752, 2006 WL 8462868, at *1–2 (E.D. La. Apr. 26, 2006) (abating an objection to a proof of claim based on a personal injury claim pending a state court's resolution of the personal injury claim).

**CONCLUSION**

Nigerian Exploration submitted to this Court's exercise of personal jurisdiction over the Trustee's claims.  Nevertheless, the Constitution commits final resolution to the District Court. This Court recommends that the District Court dismiss the Trustee's claims without prejudice.

A separate order will be issued abating the Trustee's objection to Nigerian Exploration's proof of claim.

SIGNED 05/26/2022

Marvin Isgur
United States Bankruptcy Judge